[No. H034953. Sixth Dist. June 9, 2011.]

SONIC MANUFACTURING TECHNOLOGIES, INC., Plaintiff,
Cross-defendant and Appellant, v.
AAE SYSTEMS, INC., Defendant, Cross-complainant and Appellant.

COUNSEL

Pahl & McCay, Servando R. Sandoval and Payal D. Mehta for Plaintiff, Cross-defendant and Appellant.

Law Office of Mary K. Simpson and Mary K. Simpson for Defendant, Cross-complainant and Appellant.

OPINION

**PREMO, J.**—Plaintiff Sonic Manufacturing Technologies, Inc., sued defendant AAE Systems, Inc., for breach of contract, and defendant cross-complained against plaintiff for breach of the same contract. After a court trial, the trial court found in favor of plaintiff on the complaint and cross-complaint. It entered judgment for $94,269.70. Defendant appeals from the judgment and contends that there is no substantial evidence in support of the trial court's finding that it breached the contract. Plaintiff appeals from the judgment and contends that the trial court erred by finding that defendant did not breach the contract in another respect. We agree with defendant's

contention and reject plaintiff's contention. We therefore reverse the judgment with directions to enter judgment for defendant on the complaint.[1]

## BACKGROUND

Plaintiff agreed to manufacture for and sell to defendant 500 modem cards. The contract, in the form of purchase order No. 0026667, dated April 3, 2006, provided that plaintiff would initially manufacture a "First Article" (five modem cards), "Submit First Article for approval," and then "Receive release for production." It then detailed: "After the First Article boards have been accepted, [defendant] will provide written approval and [plaintiff] may proceed with the manufacture of 100 boards. [¶] Subsequent lots will be authorized in writing in lot sizes to be specified. [Defendant] will provide as much advance notice as possible for commencement of subsequent lots." It also stated: "Factory Acceptance Test Reports are required to be approved in writing prior to shipping products." The price for the cards was specified as $431.67 each and $215,835 for the total order of 500. The contract required plaintiff to deliver the modem cards to defendant's place of business. Payment terms were "Net due 30 days."[2] The contract contemplated that defendant would supply plaintiff with some of the manufacturing materials and plaintiff would directly purchase some of the manufacturing materials. After entering the contract, certain materials that plaintiff was obligated to purchase were unavailable or had increased in price. The parties therefore agreed to increase the total purchase price for the 500 modem cards by $7,213.90 (approximately $14.43 each). On June 27, defendant issued purchase order No. 0026764 referencing one miscellaneous item at a cost of $7,213.90 stating: "This is the final PPV increase for PO# 26667." The stated payment term was "Net due 30 days." On June 27, plaintiff issued defendant a $7,213.90 invoice (No. 61650) for the purchase price variance (PPV). Plaintiff manufactured the First Article by September 19, 2006. The parties had agreed that defendant would set up a test station and perform testing of the First Article on plaintiff's premises. Defendant's engineers tested the First Article on September 22. On September 27, defendant notified plaintiff of certain problems and advised that when the "problem has been corrected and the boards updated, [defendant] will retest the boards to verify performance and the test fixture." On October 11, plaintiff returned one modem card to defendant because it proved to be defective. The First Article thus consisted

---

[1] Defendant does not challenge the judgment insofar as the judgment disposes of its cross-complaint.

[2] California Uniform Commercial Code section 2310, subdivision (d), provides that "Unless otherwise agreed . . . [¶] . . . [¶] [w]here the seller is required . . . to ship the goods on credit the credit period runs from the time of shipment . . . ."

of four modem cards.[3] On October 19, plaintiff advised defendant that plaintiff was "looking to invoice for the materials we have bought and had here in stock for months now." It gave defendant a summary of the materials and advised that it "would like to invoice the $153,834.65 that we have spent on the materials for these 500 boards. We would also like to be payed [sic] for the PPV charge of $7213.90, which was invoiced in May [sic] but has not been paid."

Defendant approved the First Article on October 27 by advising plaintiff to "Please proceed with production of the first 100 boards." Plaintiff completed manufacturing the remaining 96 modem cards by November 7. But the cards were defective because of a component supplied by defendant. Plaintiff so notified defendant. On November 14, plaintiff issued defendant a $14,880.15 materials invoice (No. 65469) for 45 modem cards regarding defendant's purchase order No. 26667 and a $149,132.17 materials invoice (No. 64716) for 451 modem cards regarding defendant's purchase order No. 26667. On December 8, defendant shipped to plaintiff 19 replacement components. On December 14, plaintiff advised defendant that the first five modem cards with the new component would be tested the next day and "Due to the no response from [defendant] on payment status our president has placed [defendant] on shipping hold." On December 18, defendant shipped to plaintiff 77 replacement components and inquired why plaintiff invoiced it via No. 64716 for 451 modem cards when it was only shipping the initial 100 modem cards.

On January 30, 2007, defendant notified plaintiff that plaintiff was "in breach of contract by failing to provide the product described in purchase order number 0026667." Defendant pointed out that it was not obligated to pay plaintiff until 30 days after delivery of the product. On January 31, plaintiff replied as follows: "Your assertion that [plaintiff] is in breach for failure to adhere to Net 30 terms is interesting given that [defendant] is on credit hold for failure to pay invoices within these terms (please refer to invoice 61650 for $7213.90 against your PO 0026764 that has remained unpaid since the invoice date of June 27, 2006). Repeated efforts to collect this debt have been ignored by [defendant]. Like every business entity, [plaintiff] reserves the right to grant and maintain credit terms based on customer ability to maintain their account in good standing. [Defendant] has not done this and has not been responsive to corrective action. [¶] We wish to further advise that the failure to deliver product against PO 0026667 is responsive to matters other than [defendant's] accounting performance. PO 0026667 required [defendant] to deliver components (consigned parts) and subsequent test equipment and procedures in support of the production schedule. The product in question cannot be built or tested without critical

---

[3] Plaintiff's president testified that only four modem cards "were built as the first articles and billed at a separate price."

items of [defendant's] responsibility. [Plaintiff] has performed its required material procurement months ago and has been awaiting [defendant's] materials which to date are still incomplete. [Defendant] has been grossly negligent and unreasonably delayed [plaintiff] in the performance of this PO, and it has not been for the 'past month and a half or so.' [Plaintiff] communicated in good faith on this situation since fall of 2006, and finally issued a material billing on November 14, 2006 when it became apparent that [defendant] was not clearing the credit hold or communicating toward any form of resolution." On February 9, defendant cancelled the contract after acknowledging that plaintiff was "unwilling to deliver the product without our meeting payment demands which far exceed what is required of us under the terms of the contract."

Plaintiff's complaint alleges that, after receiving defendant's purchase order in April 2006, it "immediately acted to procure the necessary equipment needed to assemble the units ordered under the Purchase Order and to assemble and manufacture the first 5 units." It references the PPV purchase order and that "By October 2006, [plaintiff] had waited several months for [defendant] to deliver parts needed by [plaintiff] to assemble [the cards] and was sitting on a substantial amount of parts and equipment while waiting for [defendant] to perform." It continues that plaintiff "was not agreeable to waiting for payment on the parts and equipment it purchased and therefore demanded payment on its material expenditures and on the PPV invoice, the latter of which was then four months outstanding." It reiterates that "Given the significant and unreasonable delay by [defendant] in procuring necessary parts, [plaintiff] continued to demand payment for the part expenditures it incurred." It concludes by alleging that defendant "breached the terms of the agreement because [defendant] has never agreed to pay the amounts owed under the Purchase Orders and because it has failed to perform its obligations under the Purchase Orders."

Plaintiff argued the case in accordance with its allegations. Its theory was that the delays in the manufacturing process justified its invoices for the PPV and materials: "And that it's—the expert also testified that it is within the custom and meaning—excuse me—custom and practice in the industry for a contract manufacturer to bill for those materials if there's a delay of more than 60 to 90 days. [¶] In this case, there was a 7-month delay between the time that the purchase order was issued and when they placed—and when they billed for the materials in this case. And there was an 8-month delay before [plaintiff] eventually placed [defendant] on a credit hold or shipping hold. [¶] So the only expert testimony in this case on that area testified that [plaintiff] was justified in billing for the material and then placing [defendant] on a shipping hold on December 14th, 2006." It pinpointed the theory as follows: "The evidence here is that [plaintiff] was only asking to be reimbursed for the costs that they had, in fact, actually incurred on behalf of

[defendant] for the materials, plus the PPV, which is also materials. And they were willing to provide the product with labor being billed on a net plus 30. And [defendant] would not agree to that." It concluded: "That's what this contract manufacturing was. And that was the evidence that was presented in this case, Your Honor."[4]

The trial court explained in a proposed statement of decision that defendant did not breach the contract by failing to pay the PPV invoice within 30 days of June 27, 2006, or the later-issued materials invoices: "The court finds the PPV to be nothing more than a modification of the price term of the original contract. The PPV did not call for separate or additional products to be delivered. [Defendant's] obligation to pay for the PPV coincided with its obligation to pay for goods delivered under the original purchase order." It rejected plaintiff's argument that its expert witness should be credited over the concept that the contract in question called for "net plus 30" and delivery in lots, which justified proportional payments for each delivery.[5] But the trial court found that defendant breached the contract by failing to pay for the First Article. It explained: "[Defendant] became obligated to pay for those five modem cards including the increased PPV pricing (approximately an additional $14.43 per unit) within 30 days" and the "obligation to pay $2,230.49 for the First Article arose on October 27, 2006 following [defendant's] acceptance of the First Article. [Defendant's] failure to pay for the First Article constituted a breach." It reasoned that plaintiff was entitled to the PPV prorated contract amount for five modem cards in the First Article ($2,230.49) plus lost profits on the entire contract for the remaining 495 modem cards ($92,039.21).

In its objection to the trial court's proposed statement of decision, defendant pointed out the following: "It was an undisputed fact that [defendant] did in fact pay for the First Article in question. The only evidence presented in the trial with regards to this issue showed that [defendant] did in fact pay for the First Article boards which were approved and accepted and this fact was never disputed by the Plaintiff at any time during the trial. In fact, Defendant's Exhibit R, an exhibit containing multiple pages including a summary of seven invoices and cancelled checks issued by [defendant] in payment of those invoices, specifically showed a payment made by a check dated 11/16/06 with regards to invoice number 64322 in the amount of $1,726.68

---

[4] Plaintiff's expert testified "on usage of trade to interpret [defendant's] payment obligation under the contract to require [defendant to] pay for the entire amount of the PPV and/or the entire amount of materials purchased by [plaintiff]."

[5] California Uniform Commercial Code section 2307 provides: "Unless otherwise agreed all goods called for by a contract for sale must be tendered in a single delivery and payment is due only on such tender but where the circumstances give either party the right to make or demand delivery in lots the price if it can be apportioned may be demanded for each lot."

(see attached Exhibit B). This invoice and subsequent payment by [defendant] was for the approved First Article units, which was actually for four units, based upon the contract price of $431.67 per unit. (It should be noted that only four of the first five article boards passed inspection, therefore [plaintiff] billed [defendant] only for the four units and received the subsequent payment.)"[6]

Plaintiff replied that the evidence showed that defendant failed to pay for all of the invoices when due. Plaintiff referred to exhibit R and its reference to invoice No. 63207 dated September 5, 2006, that was paid with check No. 12231 for $950.44 dated January 10, 2007. And it asserted that defendant never paid the PPV or materials invoices. Plaintiff concluded that "[t]he Statement of Decision, therefore, is supported by the law and evidence."

The trial court overruled defendant's objection and concluded that "The court found and, based on the evidence submitted by [defendant] with the [objection to statement of decision], continues to believe that defendant/cross-complainant [defendant] did not pay for the First Article in a timely manner." The court then "incorporate[d] by reference and adopt[ed], without change, the Statement of Decision issued July 29, 2009."

The trial court then rendered judgment in favor of plaintiff for $94,269.70, "plus pre-judgment interest at the rate of 10 percent per annum from October 27, 2006."

In a motion for a new trial, defendant asserted that the judgment "was based upon a finding of fact on which there was absolutely no evidence presented." Defendant stated that "Plaintiff presented only two 'invoices' which Plaintiff claimed were not paid . . . Those invoices consisted of an invoice for the PPV in the amount of $7,213.90, which was **Plaintiff's Exhibit 17**, and the 'invoice' for materials in the amount of $153,834.65 which was contained in **Plaintiff's Exhibit 32**."[7] Defendant continued that

---

[6] Exhibit R appears to be a payment history report prepared by defendant's bank as to seven invoices by plaintiff to defendant and seven payments by check by defendant to plaintiff. It refers to a check No. 012126 in the amount of $1,726.68 paid to plaintiff on invoice No. 64322 for an invoice amount of $1,726.68. The exhibit also includes cancelled check No. 12126 payable to plaintiff for $1,726.68 and dated November 16, 2006. And exhibit B to defendant's opposition is plaintiff's invoice No. 64322 to defendant dated October 27, 2006, in the amount of $1,726.68 for the assembly of four units at a unit price of $431.87. The invoice unit price is a typographical error given that the total amount of $1,726.68 is consistent with four times the contract unit price of $431.67.

[7] Exhibit No. 32 is plaintiff's advice (via e-mail) that it "would like to invoice the $153,834.65." But, as mentioned above, plaintiff ultimately sent defendant two materials invoices, one for $14,880.15 (which is exhibit No. 38) and one for $149,132.17 (which is exhibit No. 39).

"Plaintiff never submitted into evidence, nor in fact ever claimed, that the invoice for the 'First Article' . . . remained unpaid. In fact, Plaintiff presented no evidence whatsoever regarding the nonpayment of the First Article. The reason no such evidence was presented was because the invoice for the First Article was in fact paid and paid in a timely manner . . . . Though the invoice itself was not in evidence, evidence regarding payment of this invoice, however, was presented to the court by [defendant] . . . as **Defendant's Exhibit 12** which consisted of a summary of seven invoices and canceled checks evidencing payment of those invoices.[8] Six of seven of those invoices were for work performed by [plaintiff] outside the scope of the contract in question and one, specifically invoice number 64322, was for the First Article . . . . (The Court mistakenly calculated that the amount should have been $2,230.49, based upon its failure to recall the fact that only four of the five First Article had passed. [Plaintiff] correctly billed [defendant] for only the four units that passed inspection and did not include a pro-rated PPV charge for these four units.)" Defendant concluded that the trial court "based its entire decision upon its belief that [defendant] had failed to pay for the First Article and therefore was in breach of contract. As shown above, this was obviously was not the case and given the fact that there was absolutely no evidence presented to show that there was any breach regarding payment for this First Article, the Court's decision in this regard is flawed and must be reversed."

Plaintiff asserted in opposition to defendant's motion that defendant (1) "failed to submit invoice number 64322 into evidence at trial and also failed to prove at the trial that said invoice related to the First Article," (2) breached the contract "because said payment was not for the full amount due and owing as determined by the Court,"[9] and (3) "did not make timely payments on all invoices submitted by [plaintiff]."

Defendant countered that "Nowhere in [plaintiff's] opposition do they point to even a speck of evidence which was presented to support the Court's finding [that defendant had failed to pay for the First Article], because in fact, no such evidence existed or was presented to the Court."[10]

---

[8] Defendant's reference is unquestionably an error given that defendant's exhibits were designated by letter rather than number and exhibit R is the exhibit with a summary of seven invoices.

[9] Plaintiff later clarified that defendant did not pay the full amount because the trial court had determined (despite the undisputed contrary evidence) that payment for the First Article encompassed five units but defendant conceded that it had paid for only four. Plaintiff alternatively urged that defendant had not paid the full amount because defendant had failed to pay the PPV prorate of $14.43 per unit when it supposedly paid for the First Article.

[10] The record does not reflect an order denying defendant's motion for a new trial.

## DISCUSSION

Defendant contends that no substantial evidence supports that it breached the contract by failing to pay for the First Article within 30 days of delivery. As our detailed recounting of the trial and aftermath makes apparent, we agree.

■ A party alleging breach of contract must establish the existence of a contract, his or her own performance, the other party's breach, and damages suffered by the complaining party. (*Wall Street Network, Ltd. v. New York Times Co.* (2008) 164 Cal.App.4th 1171, 1178 [80 Cal.Rptr.3d 6].)

Here, no evidence establishes that defendant breached the contract by failing to pay the First Article invoice. And plaintiff points us to no evidence that would support such a breach. Moreover, defendant's underlying point is well taken. The reason no evidence exists on the point is likely because the issue was neither specifically pleaded nor encompassed within plaintiff's theory. And plaintiff likely failed to plead, raise, and argue the issue because defendant did, in fact, pay the First Article invoice as suggested by exhibit R (check corresponding to contract price of four modem cards dated within 30 days of defendant's approval of the First Article tests).

Plaintiff offers that "Exhibit R does not, however, support [defendant's] contention that it paid for the First Article units." But plaintiff has it backwards, "Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." (Evid. Code, § 500.) Thus, it was plaintiff's burden to prove each element of its cause of action—including the breach element. Plaintiff's argument assumes the opposite: that defendant had the burden to disprove a breach. That, patently, is not the law.

■ Plaintiff asserts that the evidence nevertheless supports a breach because defendant "failed to pay the 'PPV that coincided with its obligation to pay for goods delivered under the original purchase order.' " Plaintiff again has it backwards. The argument assumes that defendant had the burden to prove payment of the First Article. It is also disingenuous. The terms of a contract may be explained or supplemented "[b]y [a] course of performance." (Cal. U. Com. Code, § 2202, subd. (a).)[11] It is crystal clear that plaintiff triggered defendant's payment obligations not by relying on defendant's voluntary tenders within 30 days of delivery but by issuing invoices to

---

[11] Plaintiff argued that the California Uniform Commercial Code applied to this case. And the trial court agreed with it.

defendant. And it is also crystal clear by plaintiff's invoice No. 61650 and trial theory that plaintiff treated the PPV obligation separately from the original purchase order obligation. In short, plaintiff invoiced defendant to pay the First Article PPV in invoice No. 61650. Plaintiff therefore cannot take the position that defendant's payment of the First Article was a breach because the payment did not include a pro rata PPV.

In its appeal, plaintiff argues, without analyzing the applicable scope of review, that "substantial evidence demonstrates that [defendant] committed a breach of the agreement" because (1) "The undisputed expert witness testimony, thus establishes that [plaintiff] was completely justified in issuing the PPV [and materials invoices] to [defendant]," and (2) "[defendant] failed to commit to a delivery schedule, repeatedly declined to remit payment for the PPV, and repeatedly failed to deliver the consigned parts to [plaintiff]."

"Arguments should be tailored according to the applicable standard of appellate review." (*Sebago, Inc. v. City of Alameda* (1989) 211 Cal.App.3d 1372, 1388 [259 Cal.Rptr. 918].) Failure to acknowledge the proper scope of review is a concession of a lack of merit. (*James B. v. Superior Court* (1995) 35 Cal.App.4th 1014, 1021 [41 Cal.Rptr.2d 762].)

"We generally apply the familiar substantial evidence test when the sufficiency of the evidence is at issue on appeal. Under this test, ' "we are bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment . . . . 'In brief, the appellate court ordinarily *looks only at the evidence supporting the successful party, and disregards the contrary showing.*' [Citation.] All conflicts, therefore, must be resolved in favor of the respondent." ' [Citation.]

"But this test is typically implicated when a defendant contends that the plaintiff succeeded at trial in spite of insufficient evidence. In the case where the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment. This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case (*Oldenburg v. Sears, Roebuck & Co.* (1957) 152 Cal.App.2d 733, 742 [314 P.2d 33] [trier of fact is the exclusive judge of the credibility of the evidence and can reject evidence as unworthy of credence]; *Hicks v. Reis*

(1943) 21 Cal.2d 654, 659–660 [134 P.2d 788] [trial court is entitled to reject in toto the testimony of a witness, even if that testimony is uncontradicted]).

"Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527–1528 [103 Cal.Rptr.3d 538].)

Here, the case is the ordinary one posing evidentiary conflicts. Plaintiff had the burden to prove that defendant breached the contract by failing to timely pay the PPV and materials invoices and timely perform the other mentioned obligations. The trial court concluded that plaintiff failed to carry this burden. And it discounted the testimony of plaintiff's expert witness.[12] We decline plaintiff's invitation to examine whether substantial evidence supports his position. It is not our function to retry the case.

The reversal in this case is based on insufficiency of the evidence. " ' "When the plaintiff has had full and fair opportunity to present the case, and the evidence is insufficient as a matter of law to support plaintiff's cause of action, a judgment for defendant is required and no new trial is ordinarily allowed, save for newly discovered evidence. . . . Certainly, where the plaintiff's evidence is insufficient as a matter of law to support a judgment for plaintiff, a reversal with directions to enter judgment for the defendant is proper. . . . [¶] . . . [A] reversal of a judgment for the plaintiff based on insufficiency of the evidence should place the parties, at most, in the position they were in after all the evidence was in and both sides had rested." ' " (*Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 833 [57 Cal.Rptr.3d 430].)

■ Plaintiff had a full opportunity to present its evidence, which was insufficient as a matter of law. Defendant is therefore entitled to judgment on the complaint.

---

[12] In addition to relying on the contract language over the expert's opinion, the trial court remarked that the expert was credible, "But there is a connection between the principle [*sic*] of your company, the president, and her. Not only a social relationship, but also a business relationship."

## DISPOSITION

The judgment is reversed. The trial court is directed to enter judgment for defendant on the complaint and reiterate the judgment for plaintiff on the cross-complaint. Defendant is awarded costs on appeal.

Rushing, P. J., and Elia, J., concurred.