Filed 10/19/20  Robinson v. Select Bankcard CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| JOSHUA ROBINSON, | |
| Cross-complainant and Appellant, | G058056 |
| v. | (Super. Ct. No. 30-2017-00900137) |
| SELECT BANKCARD, INC., | O P I N I O N |
| Cross-defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Linda S. Marks, Judge.  Affirmed.  Motion to dismiss and request for sanctions denied.

Donald Lawson for Cross-complainant and Appellant.

Global Legal Law Firm and James C. Huber for Cross-defendant and Respondent.

\* \* \*

Select Bankcard, Inc. (Select) provides services and equipment to merchants wishing to process electronic payments from customers.  Select entered into an agreement with Joshua Robinson on behalf of the company Your Diabetic Supplier

(YDS). Soon thereafter, Select sued Robinson, YDS, and several other individuals after it discovered YDS owed it over $60,000, after failing to pay for reversed customer transactions ("chargebacks"), processing fees, and transaction costs.[1] Robinson filed a cross-complaint seeking relief pursuant to Civil Code section 1798.93, an action by which a person may prove he or she is a victim of identity theft in connection with a transaction that has resulted in a claim against the person.[2]

The court determined there was insufficient evidence to support (1) Select's theory Robinson was "a strawman who lent his information" to the other defendants for a profit or (2) Robinson's theory he was the victim of identity theft. Accordingly, Select and Robinson did not prevail on their complaints against each other. In this appeal, Robinson asserts there was insufficient evidence to support five factual findings listed in the court's statement of decision regarding his cross-complaint. He also maintains the court erred by concluding he failed to meet the elements of a section 1798.93 action, and he was entitled to $30,000 in damages, attorney fees, and costs. We disagree and affirm the judgment on the cross-complaint.

FACTS

The facts in this case were highly disputed. The following is a summary of the trial court's factual findings supporting the judgment, taken from its statement of decision. In January 2017, Select sued YDS, Robinson, and "the Adl defendants"[3] for breach of contract, fraud, negligent misrepresentation, and breach of the covenant of good faith and fair dealing. In October 2018, Robinson filed his cross-complaint against

---

[1]      YDS and the other defendants are not parties to this appeal.

[2]      All further statutory references are to the Civil Code, unless otherwise indicated.

[3]      The Adl defendants refer to Fardad Adl Tabatabaie and Brian Adl. The court entered default against YDS and the Adl defendants after they failed to appear in the action.

2

Select, alleging he was a victim of identity theft as defined in section 1798.92 and seeking $63,000.

The court made the following factual findings: "Select is in the business of processing orders for merchants online. It works with banks and credit card companies to facilitate sales online. Merchants who request such services are vetted by Pathway Payments, and if approved, placed with Select."[4]

It discussed Select's evidence as follows: "Select alleges . . . Robinson through his company . . . YDS[] completed a merchant account application on September 23, 2016, (Exhibit 1) and received approval for online services. Pathway Payments reviewed the application and e-[s]ignatures were provided on documents submitted, along with a fictitious business statement which was later proved at trial to be a forgery. Pathway approved the account to be managed by Select. [¶] The Web site was reviewed and deemed reliable, the application was reviewed[,] and information was believed to be accurate. [¶] Testimony was received by Jon Shipley, principal for Select[, who stated] the account had no red flags and did not operate like a fraudulent account."

The trial court gave some details about the application process. It noted Marlon Harris, a Pathway Payments employee, testified YDS submitted two applications. Brian Adl submitted the first application on behalf of YDS in April 2016, but Pathway Payments rejected it due to lack of creditworthiness. A few months later in September 2016, YDS submitted a second application under Robinson's name. Pathway Payments approved this application because of Robinson's record of good credit. The court made the following findings: "Harris testified that the Web site was detailed and complete for YDS. The information on the application matched the information on the credit report

---

[4]       Pathway Payments, an independent company, brokered the electronic payment processing agreement between Select and YDS. Pathway Payments was not a party in this case.

3

for Robinson.  Harris was led to believe that Robinson was the new owner when the second application was submitted."

The court described how fraudulent accounts are typically "opened and immediately closed with one or two payments processed."  YDS did not follow this pattern.  The evidence established the following:  "YDS was operating and delivering product between September and October of 2016.  At the end of October and early November, chargebacks started to appear on the account.  Customers were not receiving product, and the account became problematic.  YDS did not respond to e-mails, and the primary phone number was disconnected.  All contact and contact information for the merchant ceased."  In January 2017, Select sued YDS and Robinson to recover over $60,000 in chargebacks and fees.

In early February 2017, Robinson filed an identity theft police report within a week of being served with Select's complaint.  A few weeks thereafter, Robinson's attorney sent Select a letter stating, "I believe you already know that [my client] asserts that he is not the 'Joshua Robinson' you are seeking.  As a starting point, I will provide the following physical description of . . . Robinson, and request that you verify whether or not this fits the description of your defendant."  After providing a physical description, Robinson's counsel asked Select to send any pertinent contracts so he could compare the signatures.  Approximately one month later, at the end of March 2017, Robinson's counsel wrote a second letter stating he provided "sufficient information" (i.e., the physical description), for Select to determine if it was suing the wrong person and "this appears to be a circumstance of identity theft."  A few days later, Robinson filed an answer to the complaint raising the affirmative defense of identity theft.  In April 2017, Robinson filed an identity theft affidavit with the Internal Revenue Service (IRS).

In July 2017, Select asked Robinson to provide all documents supporting his claim, including the police report.  After obtaining an extension, Robinson on September 7, 2017, provided a fictitious business name statement but not the police

4

report.  Select asked Robinson to bring the requested documents and police report to his deposition in October 2017.  He failed to do so.  Thereafter, Robinson provided an incomplete copy of the police report.  Close to trial, Robinson eventually provided a full and final copy of the police report.  The original police report had multiple supplements showing Robinson repeatedly amended his report over a one-year period.

On two different occasions before trial, Select filed motions to compel the production of documents requested in discovery.  Select wanted financial information related to suspected cash payments and Robinson's decision to open a virtual office at the same time the YDS agreement was being processed.  It also requested information about Robinson's claim he owned a church, having only a few members, and the financial transactions related to that enterprise.  Robinson produced some documents, but they were often heavily redacted or unreadable.  Select complained Robinson's avoidance of deadlines and refusal to cooperate with discovery was delaying the case.  The court granted both motions and sanctioned Robinson.  Due to Robinson's evasive conduct and delay in providing a full police report, Shipley maintained at trial that Select was not fully aware of the identity theft claim until before the trial started in January 2019.

The trial court reached the following legal conclusions after examining all the evidence:  "This is an unusual case in which the evidence presented preponderates in favor of [Robinson] and against [Select] on the complaint and against [Robinson] and in favor of [Select] on the [c]ross[-c]omplaint.  There is insufficient evidence to make a finding one way or another.  It is as likely that . . . Robinson was a strawman who lent his information to the Adl defendants so that they could procure merchant line credit for YDS, and that by giving his name, Robinson profited from the scheme, as Robinson having been a victim of identity theft.  However, while not fully substantiated by the evidence at trial, Robinson's credibility may be at issue based on his evasive and contradictory testimony at trial.  While not believable, it nevertheless does not support a finding in favor of Plaintiff."

5

The trial court elaborated, "[Robinson's] failure to promptly report his concerns about identity theft to [Select], failure to produce documents subjecting him to sanctions on two occasions, and his credibility at trial raises suspicion as to Robinsons' lack of culpability. Robinson's testimony that he did not comply with discovery requests or producing records at deposition because he was afraid of being a victim of future identity theft is not believable. A protective order could have dispensed with any concerns Robinson might have had in providing his personal information. [¶] The court wonders whether the cross-complaint was filed simply to cause diversion and avoid any adverse judgment."

Nevertheless, the trial court determined Select could not prevail on the breach of contract action because it failed to establish by a preponderance of the evidence that Robinson signed the contract or that the "individual purportedly identified in the application" was Robinson. It concluded, "There is insufficient evidence to hold . . . Robinson liable, and therefore all causes of action fail as against him." It clarified, "After the [c]ourt has weighed all the evidence, it cannot determine whether an on-line merchant contract was entered on behalf of YDS by . . . Robinson or not. Therefore, consistent with CACI [No.] 200, when the existence of a fact is not more probable than its nonexistence, defendant shall prevail."

As for the cross-complaint, the trial court determined Robinson failed to meet the elements of section 1798.93. Specifically, it provided the following reasoning: "Robinson has failed to prove he was the victim of identity theft. His conduct was inconsistent with how a reasonable person would proceed. The failure to timely produce a police report, and immediately respond to the inquiries of Select raises suspicion. Select was not made aware of Robinson's claim until January of 2019. His discovery responses were evasive and contradictory, as was his testimony at trial which was self-serving regarding his finances, virtual office[,] and business dealings during the relevant time frame. While the [c]ourt had ordered sanctions on two occasions against . . .

6

Robinson for failure to comply with discovery, and limited the evidence received at trial by not considering the sanctions, but for the failure to timely respond to discovery as evidence that his behavior was inconsistent with a person making a claim of identity theft. The evidence received at trial to support a claim for identity theft appears to have been created by him after he was served with the complaint. A complete police report was not provided to defendant until close to trial." For these reasons, the court ruled in Select's favor on the cross-complaint.

In its statement of decision, the court noted trial lasted four days and concluded on February 5, 2019. The parties stipulated to a briefing schedule to submit closing briefs in lieu of closing argument the end of April 2019. The court stated it took the matter under submission, and after considering all the evidence and briefing, issued its tentative statement of decision on May 24, 2019. It noted "This tentative statement of decision shall be the [c]ourt's statement of decision unless within ten (10) days either party specifies those principal controverted issues or makes proposals not covered in the tentative decision. See [Cal. Rules of Court, rule] 3.1590(c)(4)." Our records show that neither party responded nor objected to the statement of decision within the 10-day deadline.

DISCUSSION

I. *Applicable Legal Principles Regarding Section 1798.93 Actions*

Under California's Identity Theft Act ("CITA"), a "victim of identity theft" can bring an action for damages, civil penalties, and injunctive relief "against a claimant to establish that the person is a victim of identity theft in connection with the claimant's claim against that person." (§ 1798.93, subd. (a).) A "claimant" is defined as "a person who has or purports to have a claim for money or an interest in property in connection with a transaction procured through identity theft." (§ 1798.92, subd. (a).) A "victim of identity theft" is defined as a "person who had his or her personal identifying information used without authorization by another to obtain credit, goods, services, money, or

7

property, and did not use or possess the credit, goods, services, money, or property obtained by the identity theft, and filed a police report in this regard." (§ 1798.92, subd. (d).) "A person shall establish that he or she is a victim of identity theft by a preponderance of the evidence." (§ 1798.93, subd. (b).)

Section 1798.93, subdivision (c), provides multiple remedies, including (1) a declaratory judgment that the victim of identity theft "is not obligated to the claimant on that claim" and that any security interest purportedly acquired by the claimant against the victim's property is void; (2) an injunction preventing the defendant from collecting on the claim or from enforcing a judgment against the plaintiff on the claim; and (3) actual damages, attorney's fees, costs, and appropriate "equitable relief."

In some cases, the victim of identity theft may recover civil penalties. The victim must establish "by clear and convincing evidence" that the victim provided written notice to the claimant, "the claimant failed to diligently investigate the victim's notification of a possible identity theft," and "the claimant continued to pursue its claim against the victim after the claimant was presented with facts that were later held to entitle the victim to a judgment pursuant to this section." (§ 1798.93, subd. (c)(6) ["civil penalty" of up to $30,000].)

Relevant to this appeal, the statute permits an identity theft victim to file a cross-compliant "to establish that the person is a victim of identity theft in connection with the claimant's" action "to recover on its claims against the victim." (§ 1798.93, subd. (a).) If the person successfully proves that "he or she is a victim of identity theft, as defined in [s]ection 530.5 of the Penal Code, as to a particular claim" he or she shall be entitled to "the dismissal of any cause of action in the complaint filed by the claimant based on a claim which arose as a result of the identity theft." (§ 1798.93, subd. (c)(4).)

II. *Standard of Review*

Robinson makes two main arguments on appeal. First, he asserts there was insufficient evidence to support five of the court's findings of fact in the statement of

decision.  He maintains we must apply the substantial evidence standard of review to each of those findings.  Second, Robinson argues the court erred in concluding he failed to satisfy all the elements required for a section 1798.93 action.  He contends that because this issue involves mixed questions of law and fact we must apply a de novo standard of review.  On the other hand, Select asserts we must apply an abuse of discretion standard in reviewing both arguments.  Both parties are incorrect.

"'We generally apply the familiar substantial evidence test when the sufficiency of the evidence is at issue on appeal.  Under this test, "'we are bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment . . . .  "In brief, the appellate court ordinarily *looks only at the evidence supporting the successful party, and disregards the contrary showing*."  [Citation.]  All conflicts, therefore, must be resolved in favor of the respondent.'"  [Citation.]  [¶] But this test is typically implicated when a defendant contends that the plaintiff succeeded at trial in spite of insufficient evidence.  In the case where the trier of fact has expressly or implicitly concluded that the *party with the burden of proof did not carry the burden* and that party appeals, it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.  This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusion that the party with the burden did not prove one or more elements of the case (*Oldenburg v. Sears, Roebuck & Co.* (1957) 152 Cal.App.2d 733, 742 . . . [trier of fact is the exclusive judge of the credibility of the evidence and can reject evidence as unworthy of credence]; *Hicks v. Reis* (1943) 21 Cal.2d 654, 659-660 . . . [trial court is entitled to reject in toto the testimony of a witness, even if that testimony is uncontradicted]).'"  (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465-466 (*Sonic*), second italics added.)

9

"'Thus, where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law. [Citations.] Specifically, the question becomes whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."' [Citation.]" (*Sonic, supra,* 196 Cal.App.4th at p. 466.)

III. *Analysis*

In this case, the trial court determined Robinson failed to establish an essential element needed to succeed on his section 1798.93 claim. Specifically, it determined "Robinson has failed to prove he was the victim of identity theft" and did not authorize YDS to use his information in its application. The court offered several reasons to support this determination, which Robinson has decided to treat as distinct sufficiency of the evidence questions. This is incorrect. The two issues are one and the same. The court's decision that Robinson failed to prove he was the victim of identity theft requires only our consideration of Robinson's evidence, and whether it compels a finding in his favor as a matter of law. (*Sonic, supra,* 196 Cal.App.4th at p. 466.) We need only determine if Robinson's evidence supporting his claim was uncontradicted, unimpeached, and "'"of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding."'" [Citation.]" (*Sonic, supra,* 196 Cal.App.4th at p. 466.)[5]

As mentioned, the term "victim of identity theft" as used in section 1798.93 means a person who has his personal identifying information "used without authorization

---

[5] To clarify, due to the applicable standard of review we need not separately consider Robinson's multiple sufficiency of the evidence arguments challenging select sentences of the court's statement of decision. Our focus is only on the weight and veracity of Robinson's evidence.

by another to obtain credit, [or] services . . . and did not use or possess the credit, [or] services . . . obtained by the identity theft, and filed a police report in this regard pursuant to [s]ection 530.5 of the Penal Code." (§ 1798.92, subd. (d) [defining victim of identity theft].)

Penal Code section 530.5 "criminalizes the willful *use* of someone's personal identify information for an unlawful purpose . . . ." (*People v. Jimenez* (2020) 9 Cal.5th 53, 59 (*Jimenez*)), and designates the crime is a felony. Although section 1798.92 suggests Penal Code section 530.5 discusses police reports prepared in identity theft cases, it does not mention reports. However, as explained by our Supreme Court in *Jimenez,* when the Legislature criminalized identify theft, it also enacted "a set of reporting and verification requirements for consumer credit agencies, a series of police investigation protocols for identity theft reports, and new procedures by which victims could clear their names and block inaccurate information from their credit files. [Citation.]" (*Jimenez, supra,* 9 Cal.5th at p. 64, citing Sen. Com. on Public Safety, Analysis of Assem. Bill No. 156 (1997-1998 Reg. Sess.) as amended July 3, 1997, pp. 2-3.)

The Legislature recognized law enforcement had only "'considered the defrauded business entity . . . to be the victim of identity theft, not the person whose identity was stolen so that the fraud could be committed.' (Sen. Com. on Public Safety, Analysis of Assem. Bill No. 245 (2001-2002 Reg. Sess.) as amended May 1, 2000, p. 6.) As a result, victims found it difficult to report the crime, seek damages, and clear their names. (*Ibid.*)" (*Jimenez, supra,* 9 Cal.5th at p. 63.) Consequently, the Legislature in addition to Penal Code section 530.5, enacted Penal Code section 530.6, which provides the following assistance to identity theft victims: "A person who has learned or reasonably suspects that his or her personal identifying information has been unlawfully used by another, as described in subdivision (a) of [s]ection 530.5, may initiate a law enforcement investigation by contacting the local law enforcement agency that has

11

jurisdiction over his or her actual residence or place of business, *which shall take a police report of the matter, provide the complainant with a copy of that report,* and begin an investigation of the facts. If the suspected crime was committed in a different jurisdiction, the local law enforcement agency may refer the matter to the law enforcement agency where the suspected crime was committed for further investigation of the facts." (Italics added.) Thus, we conclude section 1798.92's reference to a police report filed "pursuant to" Penal Code section 530.5, simply notifies the purported identity theft victim that law enforcement is statutorily required to create a police report and provide him or her with a copy. Accordingly, a person filing a section 1798.93 action must file an identity theft police report, triggering law enforcement's statutory duty to investigate the facts. The culprit can then be criminally charged under Penal Code section 530.5.

Robinson asserts he satisfied all the requirements needed for a section 1798.93 action because he filed a police report and established the Adl defendants improperly used his credit report and personal identifying information to enter into an agreement with Select for customer payment services. Robinson maintains his personal identifying information was used without his "authorization" because it was undisputed he did not sign the merchant account application with a wet or e-signature.

To support this assertion, Robinson refers to the testimony of his witness, Linda Mitchell, a forensic document examiner having expertise in identifying and authenticating handwriting. At trial, Mitchell clarified she also received training about e-signatures, and she co-authored an article about how to authenticate them. She examined the signature box of Select's merchant agreements and determined the markings were "not an e-signature because it does not meet the criteria of the . . . California E-Sign Act." However, she did not render an opinion about whether Robinson agreed to sign the application or authorized others to submit the application using his personal information.

12

Robinson adds there was other evidence he was not involved in the business, the application, or the credit card transactions. Specifically, he focuses on the following evidence: (1) all the income was deposited in Brian Adl's bank accounts, (2) he has always denied signing the agreement or authorizing anyone to sign the agreement, and (3) he filed an identity theft police report. Finally, Robinson referred to Harris's testimony that Pathway Payments only communicated with Brian Adl.

Except for Robinson's testimony, all of the other evidence he describes does not directly concern the essential issue of authorization. Mitchell and Harris offered no opinion about whether Robinson authorized the Adl defendants to open an account with Select. These witnesses simply supported Robinson's claim he had no direct contact with Pathway Payments/Select. Evidence that YDS's income was not deposited into Robinson's account does not rule out the possibility he was compensated in cash beforehand or by other means. And the police report simply contained Robinson's self-serving statements and allegations. There is nothing in the report suggesting the police conducted an independent investigation confirming foul play. Indeed, there is no evidence indicating any of the Adl defendants were criminally prosecuted for identity theft in the two years following Robinson's police report, or thereafter.

All that remains is Robinson's own testimony that he did not authorize the Adl defendants to use his personal information to apply for an account with Select. As mentioned, "'where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes . . . whether the appellant's evidence was . . . "uncontradicted and unimpeached" . . . .' [Citation.]" (*Sonic, supra,* 196 Cal.App.4th at p. 466.) Our review of the record shows Robinson's testimony was both contradicted and deemed untrustworthy.

Despite having significant issues with Robinson's credibility, the trial court determined Select failed to present *enough evidence* to prove Robinson was the "strawman who lent his information to the Adl defendants so that they could procure" the

13

agreement with Select. Although the evidence may not have been "enough" to secure a favorable judgment, the records shows Select certainly presented credible evidence contradicting Robinson's claim he was the victim of identity theft. Much of this evidence is detailed in its trial brief, which served as Select's closing argument. Select also pointed out multiple times Robinson contradicted his own testimony and was impeached. Select asserted, "[Robinson acted] like a culpable party throughout litigation by concealing records and subjecting himself to sanctions for discovery violations. [Citation.]"

The following are some examples of the evidence contradicting Robinson's claims. Select's president, Shipley, opined that in light of his experience and background in merchant accounts, he believed Robinson signed the application submitted to Select. He explained it was common in his industry for someone involved with a business to have another individual submit documents on their behalf. He stated sometimes this occurred when a business undergoes new ownership, or the business has sought "substitute owners" willing to receive compensation in exchange for the business using their information for the application.

Shipley added the information on the application matched Robinson's credit report and the application had none of the telling signs of fraud. He opined, "Usually with identity theft, the processing goes bad quickly in a dramatic fashion. Usually the perpetrator has a very defined plan when there's an event . . . oftentimes over a weekend because they know we . . . may not have as much coverage on staff . . . ." In this case, Shipley stated YDS had two months of normal processing of legitimate customer orders. "We know that there were legitimate customers because they were inquiring and saying we ordered product and we didn't receive it. And the account went bad slowly during" the end of October and into November 2016. He noted the chargebacks occurred slowly rather than in a "dramatic fashion" usually seen with identity theft. Another reason Shipley did not believe this was a case of identity theft was

14

because Brian Adl "made himself available" until Select sued him. Shipley stated, "Usually when identity theft happens, the perpetrator does not let you know what their identity is . . . [a]nd so . . . it would have been odd for Brian [Adl] to give us his information and . . . all of his dad's information . . . only to then commit identity theft." In addition to providing contact information, Brian Adl told Harris that Robinson took over the business, but it was being mismanaged because he was not shipping the purchased goods. Shipley stated, "the processing history supports that statement." He added Brian Adl communicated with Harris after there were chargeback events, which would be unusual in an identity theft case because usually the perpetrators disappear when there is a "loss event."

Moreover, in his briefing, Robinson ignores the trial court's plainly stated conclusion his testimony was "not believable." In the statement of decision, the court concluded it had good reason to question Robinson's credibility "based on his evasive and contradictory testimony at trial." The court added that it suspected Robinson may be culpable due to his failure to promptly report his concerns about identity theft to Select, his failure to produce documents subjecting him to sanctions on two occasions, and his credibility at trial. The court noted, "Robinson's testimony that he did not comply with discovery requests or produc[e] records at deposition because he was afraid of being a victim of future identity theft is not believable. A protective order could have dispensed with any concerns . . . . The court wonders whether the cross-complaint was filed simply to cause diversion and avoid an adverse judgment." We do not review credibility determinations. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27 [reviewing court does not reevaluate witness's credibility].)

Robinson's failure to appreciate the high hurdle he faced in this appeal is demonstrated by his bold assertion "incontrovertible evidence" established his personal information was used without his authorization. This argument ignores both the court's credibility determination and that the parties provided conflicting evidence on Robinson's

15

culpability.  We conclude any favorable inferences to be drawn from Robinson's evidence is insufficient to warrant reversal of the judgment.  As *Sonic* holds, the evidence must be such that no other result is possible.  (*Sonic, supra*, 196 Cal.App.4th at p. 466 [reversal only if uncontradicted evidence "'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding'" in appellant's favor].)  We therefore affirm the trial court on this ground.[6]

IV.  *Motion to Dismiss Appeal and Request for Sanctions*

Select asserts Robinson is subject to monetary sanctions for pursuing a frivolous appeal, which should also be dismissed.  We disagree.

"California courts have the inherent power to dismiss frivolous appeals. [Citations.]  In addition, Code of Civil Procedure section 907 provides that '[w]hen it appears to the reviewing court that the appeal was frivolous or taken solely for delay, it may add to the costs on appeal such damages as may be just.'  California Rules of Court, rule 8.276(e)(1) allows the court to impose sanctions on a party or an attorney for the taking of a frivolous appeal or appealing solely to cause delay.  An appeal is frivolous 'only when it is prosecuted for an improper motive—to harass the respondent or delay the effect of an adverse judgment—or when it indisputably has no merit—when any reasonable attorney would agree that the appeal is totally and completely without merit. [Citation.]'  [Citation.]  The first standard is tested subjectively.  The focus is on the good faith of appellant and counsel.  The second is tested objectively.  [Citation.]  'While each of the above standards provides *independent* authority for a sanctions award, in practice the two standards usually are used together "with one providing evidence of the other. Thus, the total lack of merit of an appeal is viewed as evidence that appellant must have

---

[6]       Having affirmed the trial court's determination Robinson failed to prove he was a victim of identity theft we need not address his collateral argument he was entitled to recover a $30,000 civil penalty.

16

intended it only for delay." [Citations.]' [Citation.]" (*In re Marriage of Gong & Kwong* (2008) 163 Cal.App.4th 510, 516.)

However, dismissal as a sanction is regarded as a drastic remedy, given the vague borderline between appeals that are truly 'frivolous' and those that simply have no merit. (*People ex rel. Lockyer v. Brar* (2004) 115 Cal.App.4th 1315, 1318 [dismissal "is a power that should not be used except in the absolutely clearest cases"].) For this reason, appellate courts will generally decide the appeal on its merits and then impose monetary sanctions in connection with affirmance if the appeal is deemed frivolous, i.e., any reasonable person would agree the appeal is totally and completely devoid of merit. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2020) ¶¶ 5:36-5:37; *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, 651 (*Flaherty*).)

We conclude the merits of Robinson's appeal on the cross-compliant were arguable, especially in light of the trial court's determination in Robinson's favor that there was insufficient evidence Robinson was liable for the Adl defendants' fraudulent scheme. This appeal did not present a clearly meritless case warranting dismissal and we appreciate that sanctions "should be used most sparingly to deter only the most egregious conduct." (*Flaherty, supra,* 31 Cal.3d at p. 651.) Here, Robinson's contention the court erred in interpreting the evidence supporting his identity theft claim was thoughtful. Although the trial court drew a contrary inference from the evidence, "[c]ounsel and their clients have a right to present issues that are arguably correct, even if it is extremely unlikely that they will win on appeal." (*Flaherty, supra,* 31 Cal.3d at p. 650.) It cannot be said that any reasonable person would agree that Robinson's argument was "'totally and completely devoid of merit.'" (*Id.* at p. 651.) Accordingly, this appeal was not frivolous, and we deny Select's motion.

17

DISPOSITION

We affirm the judgment.  Respondent shall recover its costs on appeal.  We deny Respondent's motion to dismiss and request for sanctions.


O'LEARY, P. J.

WE CONCUR:


IKOLA, J.


GOETHALS, J.