Filed 10/2/25  In re I.M. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re I.M., a Person Coming Under the Juvenile Court Law. | B343804 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JANET M.,<br><br>Defendant and Appellant. | Los Angeles County Super. Ct. No. 22CCJP03018B |

APPEAL from an order of the Superior Court of Los Angeles County. Cathy J. Ostiller, Judge. Affirmed.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

_____

This is an appeal from the juvenile court's order terminating Mother Janet M.'s parental rights to minor I.M. at a Welfare and Institutions Code[1] section 366.26 hearing, clearing the way for I.M. to be adopted by his longtime caretaker, Ms. K.

Mother asserts the juvenile court erred in determining the beneficial parental relationship exception to adoption in section 366.26, subdivision (c)(1)(B)(i) did not apply. Specifically, she contends substantial evidence did not support the court's finding of an insufficiently beneficial relationship; and the court abused its discretion in concluding the benefits of adoption outweighed the detriment of terminating the parental relationship.

Mother fails to show reversal is warranted. We affirm.

## BACKGROUND

I.M. is a boy born in December 2019. His father is unknown. I.M. "is globally developmentally delayed" and has significant special needs. Through the date of the order appealed, he remained largely nonverbal.

I.M. came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in May 2022, when he was just two and a half years old. At the time, he was living with Mother, an older half sister, Maternal Aunt, three cousins, and Maternal Grandmother. Maternal Grandmother played a major role in I.M.'s day-to-day care because Mother worked.

I.M. had recently presented to the hospital with a femur fracture. Mother's explanation for the injury was incompatible with the doctors' observations and inconsistent with explanations

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

offered by other family members. He was also malnourished and diagnosed with failure to thrive.

I.M. was initially left in Mother's care. However, the juvenile court ordered him detained in October 2022 after Mother failed to bring him to at least eight medical appointments for his broken leg and malnourishment. He was placed in foster care in October 2022, but returned to Mother's care the following month, subject to a court-ordered safety plan. Less than three months later, in January 2023, the court ordered I.M. detained a second time because Mother was not following the nutrition plan his treatment providers had recommended and that the court had ordered. He was again placed in foster care.

In March 2023, the juvenile court sustained an amended petition against Mother based on allegations she neglected I.M.

After multiple failed foster placements and an extended hospital stay, I.M. was placed with Ms. K. in August 2023. Ms. K. is a licensed vocational nurse who provides I.M. "exceptional attention, effectively meeting all of [his] emotional and physical needs." She expressed willingness to adopt I.M. if Mother failed to reunify with him.

Mother failed to reunify and the juvenile court terminated reunification services.

At the section 366.26 hearing, the evidence showed I.M. was adoptable. However, Mother attempted to show section 366.26, subdivision (c)(1)(B)(i)'s beneficial parental relationship exception applied. Counsel for I.M. and DCFS objected.

Mother and Ms. K. each testified. The record also included a bonding study, authored by a licensed psychologist, and a six-page analysis, prepared by a DCFS children's social worker (CSW), of the factors relevant to the beneficial parental

relationship analysis as articulated in *In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).

The evidence showed Mother visited regularly with I.M. But there was conflicting evidence about the nature and quality of the bond I.M. had with Mother. Given I.M.'s inability to speak, the juvenile court was left to rely upon the third party perspectives offered by Mother, Ms. K., and the reports' authors. The author of the bonding study implied I.M.'s limitations affected his ability to bond with Mother: "[I.M.]'s bond with mother is as strong as it can be given the severity of his Developmental Disorder . . . ." The court expressed "concerns about mother's credibility," while deeming Ms. K.'s testimony "credible."

At the time of the hearing, I.M. had just turned five. He had spent the first 33 months of his life in the care of Mother and Maternal Grandmother. But over the most recent 28 months, he had spent less than three months in Mother's care. He had been in Ms. K.'s care for the immediately preceding 17 months, and, before that, spent several months in other foster placements and the hospital.

Throughout the proceedings, Mother persistently failed to apprehend the seriousness of I.M.'s medical conditions and the extent of his treatment needs. As already noted, he was twice detained from Mother due to her failure to meet these needs.

While I.M. was under Ms. K.'s care, Mother attended some of his appointments but missed many others. She also exaggerated to the juvenile court the number she attended.

How Mother handled significant medical appointments to support I.M.'s feeding is illustrative. In the summer of 2023, I.M. was hospitalized and doctors decided to place a nasogastric feeding tube (NG-tube). Mother elected not to attend the

procedure. Mother felt her presence would have a negative effect on I.M.: she "did not want to make him more nervous." The NG-tube helped him gain weight but Mother asked to have it removed because "she felt [I.M.] was eating enough and getting 'chunky.'" A dietician had to explain to Mother that I.M. was still not able to take in enough nutrients through normal feeding and the NG-tube was necessary.

Doctors determined the following year that I.M. would benefit from a gastrostomy tube (G-tube) for long-term nutritional supplementation. Mother initially agreed to this, but later canceled the procedure. The juvenile court ordered the procedure done and it was completed in October 2024.[2]

Mother's visitation history also suggested weaknesses in I.M.'s bond with her. The juvenile court ordered visits thrice weekly for three hours but, due to her busy schedule, Mother only visited twice per week, including attendance at one of I.M.'s regular therapy sessions. Mother often cut the visits short. At the visits, she frequently allowed I.M. to use her cellphone and passed the time speaking to other adults present.

Though the record reflects a mutual affection between Mother and I.M., Mother struggled to understand his signals. For example, in one instance—which Mother cites for the proposition that I.M. looked to her for feeding—Mother ate in front of I.M. while he tried to get her attention: "It appeared as if [I.M.] was very hungry, as he would open his mouth, when he saw mother scooping up [chow mein] [with] the fork, but only put the food in her own mouth. Mother appeared to not notice, nor pay attention to [I.M.]'s face, as [I.M.] held his mouth open[] many times, in

---

[2] Contrary to DCFS's assertion in its brief, Mother did attend this procedure.

5

which, he appeared to want more food, but instead mother was feeding herself."

Mother also repeatedly, and despite guidance, misinterpreted I.M.'s signal he wanted to play—squatting on the ground—as something else. She would respond with frustration and act to restrain him rather than play with him. As described in one report: "CSW observed [Mother] to become frustrated when not knowing what social cues [I.M.] would [give to indicate] he wants to play, [i.e.,] he walks for a little and then squats in the middle of [nowhere] and wants her to engage with him as she is chasing him. [Mother] picks him up with frustration and carries him like a baby on her side and not allowing him to walk further . . . . CSW suggested to place [I.M.] back on the floor so he can walk more and also for her to engage with him. Mother did not and just caressed him once they got to the car mother buckled him and said her good byes."

With this evidence before it, the juvenile court found the beneficial parental relationship exception inapplicable and terminated Mother's parental rights to I.M.

Mother timely appealed.

## DISCUSSION

At a hearing under section 366.26, the juvenile court must select and implement a permanent plan intended to provide the dependent child a "stable, permanent" home. (*Id.*, subd. (b).) Where there is no probability of reunification with a parent, adoption is the preferred permanent plan. (*Id.*, subd. (b)(1).) For the court to select adoption as the permanent plan, it must find, by clear and convincing evidence, that the child is likely to be adopted if parental rights are terminated. (*Id.*, subd. (c)(1).) Then, in the absence of evidence that a relative guardianship should be considered, or that the termination of parental rights

6

would be detrimental to the child under one of the enumerated exceptions, the court "shall terminate parental rights." (*Id.*, subd. (c)(1)(B)(i)–(vi).) These " 'statutory exceptions merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 631.)

Under section 366.26, subdivision (c)(1)(B)(i), the beneficial parental relationship exception applies when the juvenile court finds termination of parental rights would be detrimental to the child because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Ibid.*) In *Caden C.*, our Supreme Court explained that a parent asserting the exception must satisfy three prongs: (1) "regular visitation and contact with the child, taking into account the extent of visitation permitted"; (2) "that the child has a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship"; and (3) "that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*Caden C.*, *supra*, 11 Cal.5th at p. 636.) As the elements are conjunctive, the beneficial parental relationship exception applies only where the parent satisfies all three prongs.

We review the juvenile court's findings as to the first two prongs—whether the parent has maintained regular visitation with the child and whether the child has a beneficial relationship with the parent—for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639–640.) We review the third prong—whether terminating parental rights would be

detrimental to the child due to the child's relationship with the parent—for abuse of discretion. (*Id.* at p. 640.)

In this case, there is no dispute Mother satisfied the regular visitation prong. We therefore turn to the substantial, positive, emotional attachment prong.

As Mother bore the burden of proof in the juvenile court, she can show error in the juvenile court's finding of no substantial, positive, emotional attachment only if she demonstrates the evidence compelled a finding in her favor as a matter of law. (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528, overruled on other grounds by *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) Mother fails to do so.

The requisite " 'attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.' [Citation.] A positive attachment between parent and child is necessarily one that is not detrimental to the child but is nurturing and provides the child with a sense of security and stability. Finally, an emotional attachment is one where the child views the parent as more than a mere friend or playmate and who's interactions with the parent were not ambivalent, detached, or indifferent." (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1230.)

We need not analyze the facts in detail because Mother fails to address the requisite standard that the record compels the conclusion that I.M. had a substantial, positive emotional attachment to her as a matter of law. Instead, she argues "the record substantially supports finding that [I.M.] had a substantial, positive, emotional attachment to Mother," and then proceeds to reargue the facts as if our review were independent. "Failure to acknowledge the proper scope of review is a

8

concession of a lack of merit." (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465.)

Moreover, Mother's argument elides material adverse facts. For example, she cites various visit summaries noting I.M.'s excitement to see Mother and sadness when she left. But those summaries permit the conclusion I.M. was excited to see Mother because he expected to be able to play with her cellphone and was sad when she left because her cellphone would go with her. By way of illustration, the summary of a June 19, 2023 visit states "once [I.M.] [saw] mother in the waiting room he was happy and walked towards her purse giving gestures he was looking for something. Mother stated to [I.M.] she is not going to be giving him the phone because she knows that is what he is looking for." On July 18, 2023, "mother gave her cellphone to [I.M.] as [I.M.] tried reaching for it. [I.M.] remained on mother's cellphone till the end of the visit. Mother hugged [I.M.] goodbye. [I.M.] appeared to cry and was observed to have a difficult time letting go of mother."

In performing its *Caden C.* analysis, the juvenile court expressed specific concerns, well supported by the record, that Mother was frequently observed "handing [I.M.] the phone . . . rather than actually engaging in the visit." Mother's response to this is an acknowledgment that "[I.M.] enjoyed watching videos and playing with Mother's phone" and then noting a single instance in which Mother redirected him with other activities when he was upset after she took the phone away.

We agree with Mother to the extent the record shows mutual affection and pleasant visits, but this is not enough. (See *In re C.F.* (2011) 193 Cal.App.4th 549, 555.) Though there is some evidence to support it, the record does not *compel* the conclusion that Mother's relationship with I.M. was more, from

I.M.'s perspective, than akin to a friend or playmate. (See *In re B.D.*, *supra*, 66 Cal.App.5th at p. 1230.) Mother was not reliably attentive to his needs, was not particularly engaging with him, and even conceded her presence was not always of comfort to him when she skipped his NG-tube insertion for fear of making him nervous.

Mother does make one attempt to show error as a matter of law. Citing *In re L.A.-O.* (2021) 73 Cal.App.5th 197, 210–212; *In re D.M.* (2021) 71 Cal.App.5th 261, 268, and *In re J.D.* (2021) 70 Cal.App.5th 833, 864, Mother asserts "[r]eversal is required in cases where a court merely summarily states, as the [juvenile] court did here, that the parent had not occupied a parental role and it cannot be determined whether the court considered proper or improper factors [under *Caden C.*]."

We reject this proposition as it ignores our duty to " 'presume' " juvenile courts " ' "know[] and appl[y] the correct statutory and case law." ' "[3] (*In re A.L.*, *supra*, 73 Cal.App.5th at p. 1156, quoting *People v. Thomas* (2011) 52 Cal.4th 336, 361.) We therefore must assume the court was aware of and applied the *Caden C.* factors. No such presumption arose in *In re D.M.* and *In re J.D.* because the orders at issue in those cases entered *before* May 27, 2021—the date *Caden C.* issued. (See *In re D.M.*, *supra,* 71 Cal.App.5th at pp. 267–268; *In re J.D.*, *supra,* 70 Cal.App.5th at p. 849.) *In re L.A.-O.* does not give the precise date the termination order entered, but it was as few as four days after *Caden C.* (see *In re L.A.-O.*, *supra,* 73 Cal.App.5th at p. 203 [hearing held June 2021]), meaning the county welfare

---

[3] We also note the juvenile court was under no obligation to state *any* reasons for its determination that the beneficial parental relationship exception did not apply. (See *In re A.L.* (2022) 73 Cal.App.5th 1131, 1156.)

department's report likely did not consider the circumstances through the lens of *Caden C.* (Cf. *In re D.M.*, at p. 271 [reversing because, among other things, "[t]he reports . . . did not adequately address the[] [*Caden C.*] factors"].)

Here, DCFS's report contained a robust *Caden C.* analysis, as called for by *In re B.D.*, *supra*, 66 Cal.App.5th at page 1230, footnote 5. Moreover, DCFS's argument immediately preceding the juvenile court's ruling addressed the *Caden C.* factors, and specifically the issue of "substantial positive emotional attachment." We have no reason to abandon our presumption that the court understood and applied *Caden C.*

Because Mother fails to show error in the juvenile court's finding on the second *Caden C.* prong, we need not consider the third. (*In re M.V.* (2025) 109 Cal.App.5th 486, 514.)

**DISPOSITION**

The juvenile court's order is affirmed.

RICHARDSON, J.

WE CONCUR:

LUI, P. J.

GOORVITCH, J.*

---

* Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

11