Filed 5/11/26; Modified and Certified for Partial Pub. 5/27/26 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| VOICE OF SAN DIEGO et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> SAN DIEGO UNIFIED SCHOOL DISTRICT, <br><br> Defendant and Respondent. | D084327 <br><br> (Super. Ct. No. 37-2018-00026433-CU-WM-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Keri G. Katz, Judge.  Affirmed.

Law Office of Felix Tinkov, Felix Tinkov; and Glen Smith for Plaintiffs and Appellants.

John David Loy for First Amendment Coalition as Amicus Curiae on behalf of Plaintiffs and Appellants.

Quarles & Brady, Jeffrey P. Michalowski and Jessika B. Russell for Defendant and Respondent.

INTRODUCTION

The California Public Records Act (CPRA; Gov. Code,[1] § 7920.000 et seq.) imposes a duty on an agency to determine whether a public records request seeks any disclosable records in its possession within 10 days from receipt of the request, or up to 24 days if there are "unusual circumstances." (§ 7922.535, subd. (b); see *id.*, subd. (a).) If there are disclosable records in the agency's possession, the agency is then required to make the records "*promptly available.*" (§ 7922.530, subd. (a), italics added.)

Contending that "promptly available" means " 'within days or a few weeks' " of the initial 10- or 24-day deadline, Voice of San Diego and its editor-in-chief Scott Lewis (sometimes together, Voice) alleged the San Diego Unified School District (District) routinely obstructs and delays the disclosure of public records. According to Voice, the District's average time in producing records responsive to its CPRA requests submitted over a five-year period was 399 days. Voice filed a petition for writ of mandate asserting, among other causes of action, a taxpayer claim pursuant to Code of Civil Procedure section 526a to enjoin the District's illegal expenditure of public funds to maintain the alleged unlawful CPRA practice.

The trial court rejected Voice's interpretation of the CPRA, and found the evidence did not prove the District engages in any unlawful practice of delaying or withholding public records. Because the court had previously adjudicated all other causes of action in favor of the District, it entered final judgment denying the petition for writ of mandate.

---

[1]    All further statutory references are to the Government Code unless otherwise stated.

We affirm. The CPRA does not precisely define the timeframe for the actual production of requested records, and we cannot graft a "within days or a few weeks" requirement onto section 7922.530, subdivision (a). Whether an agency has promptly produced records is to be determined case-by-case considering the scope and burden imposed on the particular agency by the particular request. We further conclude substantial evidence supports the trial court's factual findings that the District did not maintain an unlawful practice of violating the CPRA. Because there is no basis for a taxpayer action where the challenged governmental conduct is legal, the trial court properly denied the petition for writ of mandate.

BACKGROUND

I.

*Overview of the CPRA and Taxpayer Action*

To provide context for the issues in this appeal, we begin with a brief overview of the CPRA and Code of Civil Procedure section 526a which authorizes taxpayer actions.

A.    *The CPRA*

The California Legislature enacted the CPRA in 1968. (Stats. 1968, ch. 1473, § 39, p. 2945.) In doing so, the Legislature declared "access to information concerning the conduct of the people's business is a fundamental and necessary right of every person in this state." (§ 7921.000;[2]

---

[2]    Effective January 1, 2023, the Legislature recodified the CPRA. (See § 7920.005; Stats. 2021, ch. 614, § 2.) The recodification renumbered the CPRA provisions but did not substantively change the law. (*City of Gilroy v. Superior Court* (2026) 19 Cal.5th 38, 47, fn. 2 (*Gilroy*), citing §§ 7920.100– 7920.120.) We will refer to the current section numbers throughout our opinion and cross reference the former section numbers where necessary.

3

*Gilroy, supra*, 19 Cal.5th at p. 51.) To advance this fundamental right, the CPRA provides that "every person has a right to inspect any public record, except as otherwise provided." (§ 7922.525, subd. (a).) Unless the Legislature has expressly provided an exemption, " ' "all public records are subject to disclosure." ' " (*Gilroy*, at p. 51.)

The CPRA's right of access was enshrined in the state Constitution by the voters' passage of Proposition 59 in 2004. The measure added Article I, section 3, subdivision (b)(1), which states: "The people have the right of access to information concerning the conduct of the people's business, and, therefore, the meetings of public bodies and the writings of public officials and agencies shall be open to public scrutiny." (Cal. Const., art. I, § 3, subd. (b)(1).) This right of access was implemented with the imperative that "[a] statute, court rule, or other authority . . . shall be broadly construed if it furthers the people's right of access, and narrowly construed if it limits the right of access." (*Id.*, subd. (b)(2).)

"The CPRA prescribes detailed procedures governing an agency's response to a public records request." (*Gilroy, supra*, 19 Cal.5th at p. 52.) It specifies two steps an agency must take in its response. First, the agency must determine whether the request for public records seeks any disclosable records in the agency's possession within 10 days from receipt of the request, and then "promptly" notify the requester of its determination and its reasons for withholding any records. (§ 7922.535, subd. (a).) The agency is further required to "state the estimated date and time when the records will be made available" if it "determines that the request seeks disclosable public records." (*Ibid.*) The 10-day deadline may be extended only in six specified "unusual circumstances" and, in any case, may not "result in an extension for more than 14 days," for a total of 24 days. (*Id.*, subds. (b), (c)(1)–(6).)

4

Second, the agency must produce the requested records. Here, section 7922.530, subdivision (a), provides that the agency "shall make the records *promptly available* to any person upon payment of fees covering direct costs of duplication, or a statutory fee if applicable." (Italics added.) Section 7922.500 further provides, "Nothing in [the CPRA] shall be construed to permit an agency to delay or obstruct the inspection or copying of public records." Our high court has observed that these CPRA provisions "impose a general duty on agencies to act promptly." (*Gilroy, supra*, 19 Cal.5th at p. 52.)

The CPRA authorizes any person seeking "to enforce that person's right under [the CPRA] to inspect or receive a copy of any public record or class of public records" to bring an action for injunctive or declaratory relief or a writ of mandate to obtain judicial review of an agency's decision not to disclose requested records. (§ 7923.000.) If, after issuing an order to show cause, the court determines "the public official's decision to refuse disclosure is not justified" under the CPRA, it "shall order the public official to make the record public." (§§ 7923.110, 7923.100.) Thus, the remedy available under the CPRA is ordinarily a determination "whether a particular record or class of records must be disclosed."[3] (*County of Santa Clara v. Superior Court*

---

[3]    Although there is no claim the trial court erred in denying Voice relief on its causes of action brought under the CPRA, the California Supreme Court recently held that "declaratory relief under the CPRA is available in at least some circumstances in which all existing responsive, nonexempt records have been disclosed in response to a records request. An Agency's disclosure of those records does not necessarily moot a request for declaratory relief that would 'enforce that person's right under this division to inspect or receive a copy of any public record or class of public records.' (§ 7923.000.) At a minimum, declaratory relief is available under the CPRA where the declaration would resolve an ongoing dispute regarding the parties' rights

(2009) 171 Cal.App.4th 119, 127 (*Santa Clara*) ["The CPRA provides *no* judicial remedy . . . for any purpose other than to determine whether a particular record or class of records must be disclosed."].)

B.      *Taxpayer Action*

Although "the CPRA provides the exclusive remedy for resolving whether a public entity has erroneously refused to disclose a particular record or class of records," a taxpayer citizen may bring an action under Code of Civil Procedure section 526a[4] to prevent fiscal waste from the implementation and enforcement of policies and practices alleged to be violative of the CPRA. (*Santa Clara, supra*, 171 Cal.App.4th at p. 130; see *id.* at pp. 128–129.)

Code of Civil Procedure section 526a "authorizes actions by a resident taxpayer against officers of a county, town, city or city and county to obtain an injunction restraining and preventing the illegal expenditure of public funds." (*Blair v. Pitchess* (1971) 5 Cal.3d 258, 267, superseded by statute on other grounds as stated in *Taking Offense v. State of California* (2025) 18 Cal.5th 891, 914–919.) Its "primary purpose" is to "give a large body of citizens standing to challenge governmental actions." (*Blair,* at p. 269.)

---

and obligations in a manner that has some likelihood of affecting future requests for public records or future conduct relating to such requests." (*Gilroy, supra,* 19 Cal.5th at pp. 45–46.)

[4]      "An action to obtain a judgment, restraining and preventing any illegal expenditure of, waste of, or injury to, the estate, funds, or other property of a local agency, may be maintained against any officer thereof, or any agent, or other person, acting in its behalf, either by a resident therein, or by a corporation, who is assessed for and is liable to pay, or, within one year before the commencement of the action, has paid, a tax that funds the defendant local agency." (Code Civ. Proc., § 526a.)

"[N]o showing of special damage to the particular taxpayer" is required, and it is " 'immaterial that the amount of the illegal expenditures is small or that the illegal procedures actually permit a saving of tax funds.' " (*Id.* at p. 268.) The mere expending of time by any paid public employee in the performance of illegal and unauthorized acts may constitute unlawful use of public funds, warranting an injunction under Code of Civil Procedure section 526a. (*Blair,* at p. 268.) All this, of course, makes clear that "[a] taxpayer action does not lie where the challenged governmental conduct is legal." (*Lyons v. Santa Barbara County Sheriff's Office* (2014) 231 Cal.App.4th 1499, 1503 (*Lyons*); accord *Coshow v. City of Escondido* (2005) 132 Cal.App.4th 687, 714 (*Coshow*).)

## II.

### *Voice's Petition for Writ of Mandate*

Voice is an online news service based in San Diego. It devotes extensive coverage to matters of public interest with a focus on local government affairs. Reporting on education is particularly important to Voice and its readers, with two or more reporters working on local school issues at any given time. Like many news organizations, Voice relies heavily on CPRA requests to obtain information from local, regional, and state agencies for their reporting on government activities. From 2015 through 2020, Voice regularly submitted CPRA requests to the District, in such a volume that Voice was the District's most prolific requester of public records.

In May 2018, Voice filed a verified petition for writ of mandate against the District, alleging that the District engages in "the regular and ongoing practice . . . to delay, obstruct and withhold public records in a manner contrary" to the CPRA. Voice asserted three causes of action under the CPRA, seeking declaratory and injunctive relief. In February 2021, Voice

7

amended its petition to add a taxpayer cause of action under Code of Civil Procedure section 526a, and Lewis (Voice's Chief Executive Officer and Editor-in-Chief) as a plaintiff.[5]  As to this fourth cause of action, Voice alleged the District's use of public money to carry out its allegedly unlawful CPRA practice constitutes an illegal expenditure of public funds that should be enjoined.

III.

*Proceedings Before Adjudication of the Taxpayer Cause of Action*

The litigation that followed spanned six years.  Discovery was extensive, and so was the parties' briefing of numerous issues that came before the trial court in multiple proceedings.  Here, we summarize the proceedings before the court adjudicated the taxpayer cause of action.

A.    *District's Motion for Summary Adjudication*

On June 11, 2021, the trial court granted the District's motion for summary adjudication of a portion of the first cause of action and the third cause of action under the CPRA, as against Voice only.[6]

In paragraph 34 of the first cause of action, Voice alleged the District violated section 7922.535, subdivision (a) (former § 6253, subd. (c)), of the CPRA " 'by failing to secure responsive records within the statutory 10-day initial response period.' "  The court determined this claim failed, as a matter of law, because the CPRA "does not require agencies to '*secure* responsive records' within 10 days of receiving a request."  (Italics added.)

---

[5]    We will refer to the operative first amended verified petition for writ of mandate as "the petition" throughout this opinion.

[6]    Lewis was not subject to the District's motion for summary adjudication because he had received insufficient notice of the motion.

The trial court also determined the third cause of action failed, as a matter of law, because "the injunctive relief Voice seeks is an impermissible 'comply with the law' injunction."

Accordingly, the trial court summarily adjudicated the section 7922.535, subdivision (a), claim of the first cause of action and the entire third cause of action in favor of the District against Voice.[7]

B.    *Voice's 31 CPRA Requests at Issue*

During the litigation, the trial court ordered Voice to prepare an index of the public records requests for which it contends the District unlawfully delayed responsive records. Voice identified 31 CPRA requests it made to the District between October 8, 2015 and March 3, 2020, providing the dates of submittal and only the dates of the *last* production of responsive records. In contrast, the District provided *all* production dates, including the *first* dates on which it provided records in rolling productions. This difference resulted in a different calculation of the District's production time in multiple instances. The District also provided its justification for any delay in production and an explanation of its general process for responding to CPRA requests.

---

[7]    The trial court's ruling on the District's summary adjudication motion is not properly before us. As we later discuss, Voice's failure to specifically challenge the court's adverse ruling on its duty of determination claim under section 7922.535, subdivision (a), results in forfeiture of this claim on appeal.

9

C.      *Hearing on the CPRA Causes of Action*

The trial court bifurcated the hearing on the merits of the petition into two phases.  It first held a hearing to adjudicate the CPRA causes of action in December 2022, and another hearing to adjudicate the taxpayer cause of action in February 2024.

In its briefing for the December 2022 hearing, Voice identified just three record requests as the basis for its CPRA causes of action.  They were numbered FY20152016.062, FY20152016.136 and FY20192020.151 (together, misconduct requests).[8]  By these requests, Voice generally sought information pertaining to allegations of sexual misconduct and abuse perpetrated by a teacher employed at one of the District's high schools.  Voice asserted the District delayed and withheld records responsive to these requests, in violation of sections 7922.530 (former § 6253, subd. (b)) and 7922.500 (former § 6253, subd. (d)).  Specifically, it contended the District produced only non-responsive documents that were extensively redacted.  Voice sought a court order compelling the District to release all responsive records and remove all improper redactions.

Relying on *Citizens for Responsibility and Ethics in Washington v. Federal Election Commission* (D.C. Cir. 2013) 711 F.3d 180 (*Citizens*), a case interpreting the federal Freedom of Information Act (FOIA), Voice argued the term "promptly available" in section 7922.530, subdivision (a), is to be interpreted to mean production of responsive records must occur " 'within days or a few weeks, . . . not months or years' " of the 10- or 24-day deadline

---

[8]      Because these CPRA requests were also litigated at the subsequent hearing on the taxpayer cause of action, we describe them and the parties' related contentions in further detail later in the opinion.

10

for the initial determination. The District responded there is nothing in the CPRA that requires production of responsive records "within a specified period of time," and that the CPRA "provides no remedy for failure to timely comply with a request for records."

As to allegations that it improperly withheld records, the District submitted the declaration of Jeffrey Day, its CPRA officer, to explain the District's general process of handling CPRA requests and its process in responding to the three misconduct requests. Day averred the District did not withhold any documents "in their entirety on the basis of privilege or exemption" responsive to the first two requests, but did redact and withhold responsive documents on the basis of student and employee privacy as to the third.

Consistent with its ruling on the motion for summary adjudication, the trial court rejected Voice's argument that the 10-day deadline under section 7922.535, subdivision (a) (former § 6253, subd. (c)) "governs the time period within which records are to be made available." The court noted the plain language of section 7922.530, subdivision (a) (former § 6253, subd. (b)), requires that records only be made " 'promptly available.' " On this point, the court rejected Voice's reliance on *Citizens* that "promptly available" under the CPRA meant " 'within days or a few weeks' " of the initial 10-day deadline.

As to the District's production for the misconduct requests, the trial court found, with one limited exception,[9] that Voice had failed to meet its

_____

[9] The trial court did find the District improperly redacted " 'the names of the teachers who were the subject of allegations of assault and/or sexual misconduct' " from records produced in response to the third misconduct request. Accordingly, the court ordered the District to produce unredacted records to the court or show cause by submitting a declaration supporting why certain teacher names should not be produced. After the District filed a

11

burden of proving any CPRA violation.  Specifically, the court found the evidence did not establish the District improperly delayed, withheld, or redacted any responsive records.  Accordingly, on December 20, 2022, the trial court denied the petition as to the first, second, and third causes of action under the CPRA.[10]

## IV.

### *Hearing on Taxpayer Cause of Action*

The trial court adjudicated Voice's remaining taxpayer cause of action in February 2024.  The parties submitted extensive briefings and numerous witness declarations for this hearing.  Together, they lodged nearly 5,500 pages of exhibits.

### A. *Voice's Contentions*

As noted, Voice alleged the District's use of public funds to carry out its unlawful practice of delaying and obstructing the release of public records constitutes an illegal expenditure of public funds that should be enjoined under Code of Civil Procedure section 526a.  In its briefing for this hearing, Voice explicitly framed that "[t]he question before the [trial c]ourt is whether [the District] may ignore the legislative mandate under [the CPRA] requiring disclosures be made promptly (Gov. Code, § 7922.530)" and that it was suing "to enjoin waste of taxpayer funds by [the District] in its failure to comply with the prompt disclosure requirements set forth in the CPRA."  As such, the trial court understood this to be the dispute before it at the hearing on

---

declaration in response to the order to show cause, the parties stipulated that Voice no longer wanted to pursue disclosure of the names.

10    The trial court's ruling on the CPRA causes of action is also not properly before us because, again, Voice does not specifically challenge it.

the taxpayer cause of action and that Voice had identified Government Code section 7922.530's duty of prompt disclosure, buttressed by section 7922.500's general prohibition against delay or obstruction, as the CPRA provision it alleged the District "routinely abrogates."[11]

Relying on *Citizens*, Voice again argued production of public records under section 7922.530 "must be made within days or weeks, not months or years"[12] of the initial determination. (Capitalization and boldface omitted.) Under this standard, Voice claimed that the District "blatantly disregards" its duty to make prompt disclosures, instead "averaging 399 days to produce records requested by Voice," with its shortest amount of time being over a month and its longest as over five years. (Capitalization and underlining omitted.) Voice claimed that the District "constructed a system intended to slow down CPRA responses," including by employing a single CPRA officer who lacked formal training and was "ignoran[t]" of the CPRA requirements; whose absence brings the process to a "screeching halt" until he returns; and whose process of working on groups of 10 to 12 requests at a time ensures backlog and delay.[13]

---

[11] On appeal, Voice does not claim the trial court misidentified the CPRA provisions relied on by Voice for its taxpayer cause of action.

[12] In its reply brief, Voice argued "production typically must be made within a month." (Capitalization and boldface omitted.)

[13] In making this claim that the District "constructed a system intended to slow down CPRA responses," Voice resurrected its complaint—previously rejected by the trial court when it granted summary adjudication of this issue in favor of the District in June 2021, which Voice does not challenge—that the District's CPRA officer's "efforts to gather records in response to the public's CPRA requests are routinely ignored [by the District's record custodians]" and, as such, the District does not meet its 10-day deadline for

B.    *District's Response*

The District again responded that the CPRA does not mandate "a strict timeline" for public agencies to produce responsive records.  Instead, the District argued "promptness is relative to the request," requiring the courts to consider "the breadth, context, and specificity of the request, the nature of the records requested, review [required] of such records, the volume of other requests received, and the resources available to the agency."

As to the 31 CPRA requests at issue, the District asserted the evidence failed to show it intentionally delayed or withheld records responsive to them. The District submitted two more declarations by its CPRA officer, Day, to explain the District's process of handling public records requests generally and its process of responding to each of the 31 requests at issue, and the declaration of Joseph W. Pannone, a municipal law attorney with expertise in CPRA practices.  We discuss the District's response to Voice's 31 CPRA requests in detail later in our review of the court's factual findings for substantial evidence.  Here we summarize Day's and Pannone's testimony about the District's process generally.

The San Diego Unified School District is the second largest school district in California, with 181 schools.[14]  It receives a high volume of CPRA

---

the initial determination under section 7922.535, subdivision (a).  Here, we do not address Voice's limited reference to section 7922.535; to the extent it relies on this provision as a basis for its taxpayer cause of action on appeal, we discuss it later and conclude it has not been preserved for our review.

[14]    We deny the District's request for judicial notice of the "Departments page" of its website because, as the District acknowledges, it was not presented to the trial court.  (See *Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 444, fn. 3 ["Reviewing courts generally do not take judicial notice of evidence not presented to the trial court.  Rather, normally 'when

requests each year. Day is the District's single CPRA officer and is responsible for receiving and responding to all public record requests, which includes locating, collecting, and producing responsive documents to members of the public.

Upon receipt of a public records request, Day first determines whether the District has responsive documents in its possession within 10 days of the request. If a request is overly broad or unclear, Day communicates with the requester to help clarify or limit the request. He drafts a response with his initial determination to the requester, sends it to the District's attorney for approval and, once approved, sends the final response to the requester.

At the same time, Day assesses where the requested records might be within the District, which spans multiple departments and 181 schools, and contacts individuals to obtain responsive documents. Depending on the request, searches could require inquiry into both electronic and hard copy documents located at any of the District's multiple departments.[15] At the

---

reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' "].)

[15] For requests that include e-mail, Day causes the Information Technology (IT) department to run a search using terms and a potential date range found in the request. Depending on the complexity of the search and volume of e-mail involved, results may take "10 minutes to several days later." If the search volume is too large, IT will break the search into "separate smaller searches" and even when it operates correctly, the volume of e-mail returned may be too large to export, requiring IT to break the search up into multiple smaller searches. If "the scope of the search is simply too large," IT may request that Day work with the requester "to narrow down the search to a manageable scope." And because IT runs only one search at a time "to ensure each one completes properly," the District prioritizes "time sensitive search requests" such as those from police departments over others.

time the litigation commenced, the District maintained over 1 billion e-mails on its network servers. Once Day receives the records, he reviews them for responsiveness and conducts a second review to identify documents that must be withheld or redacted based on attorney-client privilege, student privacy, or other CPRA exemptions. Day sends these documents to the District's attorney for review and, once approved, Day sends the finalized documents to the requester.

During the relevant five-year period, 2015 to 2020, the District received an average of 320 requests per year.[16] In 2015 and 2016, the District processed requests in the order received, but since 2017 it has taken requests out of order so that large requests do not delay narrower and less time consuming requests. Day typically works on a group of 10 to 12 requests at a time, adding a new request to the group only when one response is completed.

During this five-year period, the District received over 75 CPRA requests from Voice. Day averred he has never been requested to delay or withhold production of records from Voice, "other than for legitimate reasons" such as verifying accuracy or completeness, and he has never delayed his

After the search is done and the e-mails exported, IT performs a quality check and sends Day an Outlook data file containing the e-mails. Day then reviews the e-mails for responsiveness to the request and does another second-level review to determine if any need to be withheld or redacted for attorney-client privilege, student privacy, or another applicable statutory exemption. Day then sends the responsive documents, including proposed redactions, to the District's attorney for review and, if approved, to the requester.

[16] The District received 278 public record requests in the 2015–2016 school year; 326 in the 2016–2017 school year; 300 in the 2017–2018 school year; 383 in the 2018–2019 school year; and 315 in the 2019–2020 school year.

efforts to search for records for Voice "beyond the prioritizing that occurs for all requests." Day explained, to the contrary, he spent "substantially more time" gathering and reviewing records for Voice than any other requester and, in his view, Voice's requests were "consistently the most vague and overbroad."

Pannone, a licensed attorney who has exclusively practiced municipal law for more than 40 years, was offered as an expert on the CPRA practices of various public agencies, including the school districts in Fresno, Long Beach, and San Bernardino City; as well as the County of San Diego.[17] Like the District, these school districts also charge one employee with handling CPRA requests from initial review to production of records. The County of San Diego employs two CPRA officers, but both have other assigned duties. Based on his experience as a city attorney representing the cities of Baldwin Park, Bellflower, Culver City, Lompoc, Morro Bay, Palos Verdes Estates, and South Pasadena, Pannone explained they too had only one employee (the city clerk) assigned to handle CPRA requests.

According to Pannone, these cities' and public agencies' CPRA processes are "substantially the same" as the District's. In Pannone's opinion, the time to respond to a records request can vary depending on the volume and type of documents sought, as well as the volume of other record requests. And "[i]n some cases, depending on the breadth of the request and the search terms, the number of records requiring review, the nature of the records reviewed, and the volume of other requests, production of records

---

[17] The trial court overruled Voice's evidentiary objections to Pannone's declaration, and Voice has not challenged the court's ruling on appeal.

17

may take over one year, or more to complete. In such cases, public agencies sometime produce records on a 'rolling basis.' "

C.    *Trial Court's Ruling*

The trial court, for a second time, rejected Voice's contention (and its reliance on *Citizens*) that section 7922.530, subdivision (a), requires a public agency to produce responsive documents within days or weeks of the initial determination upon receipt of a request. Instead, the court interpreted the term "promptly" in section 7922.530, subdivision (a), to "allow[ ] for an evaluation of a variety of factors in assessing the promptness of an entity's production of records."

Turning to the evidence, the trial court credited Day's declarations explaining the District's response to each of the 31 CPRA requests and found the evidence did not establish the District unlawfully delayed or withheld responsive documents. It further credited Day's and Pannone's declarations in rejecting Voice's contentions that the District "constructed a system intended to slow down CPRA responses." Additionally, the court found "the majority" of the requests "[we]re very broadly worded and cover[ed] extensive periods of time." The requests were also complicated by Voice often requesting information in several formats, including final documents as well as drafts, addendums, and modifications. Many of the requests required the District to search and review both electronically stored and hard copy records maintained by multiple departments across the District, and triggered student or employee privacy exemptions that required redaction. And the District was processing Voice's requests amidst a heavy volume of public record requests during the 2015 to 2020 time period. The court determined all of these circumstances were relevant and justified the District's production time for Voice's requests.

18

Because Voice failed to establish any unlawful CPRA practice, the trial court found no basis for finding there was an illegal expenditure of public funds within the meaning of Code of Civil Procedure section 526a. This order disposed of the last of Voice's claims. Accordingly, the court entered a final judgment in favor of the District denying the petition in March 2024.

## DISCUSSION

On appeal, Voice challenges the trial court's denial of its petition only as to the taxpayer cause of action. It contends the court erred in denying injunctive relief under Code of Civil Procedure section 526a because, in its view, the District maintains an unlawful practice of violating two provisions of the CPRA: the duty of determination under section 7922.535, and the duty of disclosure under section 7922.530. As we shall explain, Voice has failed to preserve its section 7922.535 duty of determination claim. As to its section 7922.530 duty of disclosure claim, Voice advances the same arguments that it made in the trial court. In doing so, Voice fails to persuade us of any error. We address Voice's duty of disclosure claim first.

I.

*"Promptly Available" Under Section 7922.530, Subdivision (a)*

Relying once again on *Citizens*, Voice asserts section 7922.530's term "promptly available" means production of disclosable records must be made within "a few days or weeks, not months or years" of the initial determination that is made 10 or 24 days upon receipt of the request. Voice contends the trial court erred in rejecting this construction, and instead construing the provision to " 'allow[ ] for an evaluation of a variety of factors' " that are "nowhere in the law." We find no error, because we also disagree with Voice's construction of the statute.

19

"Statutory interpretation is a question of law that we review de novo."
(*Bruns v. E-Commerce Exchange, Inc.* (2011) 51 Cal.4th 717, 724.) " 'Our
fundamental task in interpreting a statute is to determine the Legislature's
intent so as to effectuate the law's purpose.' " (*Ibid.*) We begin by looking to
the statutory language, " 'giving it a plain and commonsense meaning. We do
not examine that language in isolation, but in the context of the statutory
framework as a whole in order to determine its scope and purpose and to
harmonize the various parts of the enactment.' " (*Ibid.*) " 'If the language is
clear in context, our work is at an end. If it is not clear, we may consider
other aids, including the statute's legislative history.' " (*Gilroy, supra*,
19 Cal.5th at p. 51.)

We turn to the language in section 7922.530, subdivision (a). It
provides, "Except with respect to public records exempt from disclosure by
express provisions of law, each state or local agency, upon a request for a copy
of records that reasonably describes an identifiable record or records, shall
make the records *promptly available* to any person upon payment of fees
covering direct costs of duplication, or a statutory fee if applicable." (Italics
added.) By its plain text, section 7922.530, subdivision (a), does not set any
deadline expressed in number of days for the actual production of records.
(See *Rittiman v. Public Utilities Commission* (2022) 80 Cal.App.5th 1018,
1035 [construing former § 6253, subd. (b), the "[C]PRA does not set forth a
specific timeframe for actual production of requested records"]; *Motorola
Communication & Electronics, Inc. v. Dept. of General Services* (1997)
55 Cal.App.4th 1340, 1349 (*Motorola*) [same].)

To accept Voice's argument, we would have to insert words such as
"days or weeks," or some other quantification of time, into the statute. Doing
so would violate the cardinal rule that a statute "is to be interpreted by the

20

language in which it is written" (*People v. Campbell* (1902) 138 Cal. 11, 15), and that "[w]e must presume the Legislature meant what it said, and we may not add words to the statute under the guise of legislative interpretation" (*Linovitz Capo Shores LLC v. California Coastal Commission* (2021) 65 Cal.App.5th 1106, 1122, citing *Burden v. Snowden* (1992) 2 Cal.4th 556, 562 ["Where the words of the statute are clear, we may not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history."]).

But unlike the duty of disclosure, the CPRA *does* precisely define the time in which a public agency must comply with its duty of determination under section 7922.535, subdivision (a). As noted, section 7922.535, subdivision (a), provides that "upon a request for a copy of records," a public agency "shall, within 10 days from receipt of the request, determine" whether the request seeks disclosable public records in its possession. The 10-day deadline may be extended in specified "unusual circumstances" but, in any case, may not "result in an extension for more than 14 days," for a total of 24 days. (§ 7922.535, subds. (b), (c)(1)–(6).) Thus, the Legislature clearly knows how to draft language to impose precise deadlines for compliance with a CPRA duty. That it did not do so with the duty of disclosure under section 7922.530, subdivision (a), significantly undercuts Voice's argument.

As the California Supreme Court has observed on many occasions, "the CPRA describes its procedures . . . 'in exceptionally careful detail.' " (*Haynie v. Superior Court* (2001) 26 Cal.4th 1061, 1073; accord *Gilroy, supra,* 19 Cal.5th at p. 52 [the "CPRA prescribes detailed procedures governing an agency's response to a public records request"].) Its silence regarding any requirement, "suggest[s] that no such requirement exists." (*Gilroy,* at p. 46.) For this reason, our high court has declined to add to the CPRA a records

21

retention requirement (*Gilroy*, at p. 65), or a requirement that an agency create a log of withheld documents as part of its initial determination (*Haynie*, at pp. 1073–1074). The same result obtains here. Because the Legislature chose not to define a precise deadline by which public agencies must produce disclosable public records, we will not create one. (See *id.* at p. 1074 [given the CPRA's detailed scheme, "it would be inappropriate for us to enlarge the agency's burden under the guise of interpreting the statute"].)

*Citizens* does not persuade us to reach a different result. Although judicial construction of the FOIA may serve to illuminate our analysis, "we are not bound by decisions interpreting the FOIA" in interpreting the CPRA. (*Gilroy, supra*, 19 Cal.5th at p. 60 ["general sensitivity to judicial construction of the FOIA does not mean the CPRA and FOIA should be interpreted as imposing the same requirements in all instances"].) The two statutes are to be given "parallel construction" but only where *"appropriate with respect to the question presented* and the circumstances of the case." (*Gilroy*, at p. 60, citing *American Civil Liberties Union Foundation v. Deukmejian* (1982) 32 Cal.3d 440, 451, italics added.)

The question presented in *Citizens* involved statutory construction of a different term altogether: "what constitutes a '*determination*' so as to trigger the exhaustion requirement" to permit a requester to file his or her FOIA suit. (*Citizens, supra*, 711 F.3d at p. 185, italics added; see *id.* at p. 182.) *Citizens* interpreted the FOIA provision that is analogous to the CPRA's section 7922.535, subdivision (a)'s duty of determination—not section 7922.530, subdivision (a)'s duty of disclosure, which is the provision at

issue here.[18]  (*Citizens*, at p. 184 ["The statutory timeline relevant" to *Citizens'* analysis of the exhaustion requirement was the "20-working-day timeline" for the agency to provide its initial determination upon receipt of a FOIA request].)  Because there was no parallel construction of the relevant statutory term before us, *Citizens* gives us no guidance.

As to the duty of determination, the *Citizens* court held that to trigger the exhaustion requirement, "the agency must at least . . . gather and review the documents" and "determine and communicate the scope of the documents it intends to produce and withhold" within FOIA's 20-working-day timeline. (*Citizens, supra*, 711 F.3d at p. 188.)  It was in clarifying that an agency's " 'determination' does not require actual *production* of the records" under FOIA (*ibid*.) that the court made the statement Voice continues to rely on. The court said:  "As to actual production, FOIA requires that the agency make the records 'promptly available,' which depending on the circumstances typically would mean within days or a few weeks of a 'determination,' not months or years." (*Ibid*.)  We find this one-sentence dictum[19] unhelpful

18    The FOIA provision is title 5 of the United States Code, section 552(a)(6)(A)(i), which provides that "once an agency receives a proper FOIA request, the agency shall:  [¶] determine within 20 days . . . after the receipt of any such request whether to comply with such request and shall immediately notify the person making such request of such determination and the reasons therefore, and of the right of such person to appeal to the head of the agency any adverse determination." (*Citizens, supra*, 711 F.3d at p. 184.)

19    Aside from it being dictum, Voice's reliance on this statement from *Citizens* as supportive of a rigid timeline is misplaced because the court also stated that after the initial determination is made within 20 working days (30 in " 'unusual circumstances' "), "the agency may still need some *additional time* to physically redact, duplicate, or assemble for production the

because it was unaccompanied by any statutory analysis of the language of title 5 of the United States Code, section 552, subdivision (a)(3)(A),[20] the analogous provision to our section 7922.530, subdivision (a).

We therefore reject Voice's invitation to "devise a specific deadline" for an agency to produce responsive records under section 7922.530.[21]  By choosing to state only *generally* that an agency shall make public records "promptly available" upon payment of fees for their duplication, the Legislature has opted for a deliberately flexible term, not a fixed time frame.

---

documents that it has already gathered and decided to produce.  The agency must do so and then produce the records 'promptly.' " (*Citizens, supra*, 711 F.3d at p. 189, italics added.)

[20]   "Except with respect to the records made available under paragraphs (1) and (2) of this subsection, and except as provided in subparagraph (E), each agency, upon any request for records which (i) reasonably describes such records and (ii) is made in accordance with published rules stating the time, place, fees (if any), and procedures to be followed, shall make the records promptly available to any person."  (5 U.S.C. § 552, subd. (a)(3)(A).)

[21]   We have considered that the standard approach to statutory interpretation in CPRA cases is " 'augmented' " by the constitutional provision calling for a broad construction of the CPRA " 'if it furthers the people's right of access' " (*Gilroy, supra*, 19 Cal.5th at pp. 51–52, quoting Cal. Const., art. I, § 3, subd. (b)(2)), but we believe it does not compel a different conclusion.  Where the legislative intent is ambiguous, this constitutional provision would require us " 'either to broadly or to narrowly construe [the CPRA], whichever way will further the people's right of access.' " (*Gilroy*, at pp. 68–69.)  " 'But this rule of construction does not require the courts to resolve every conceivable textual ambiguity in favor of greater access, no matter how implausible that result in light of all the relevant indicia of statutory meaning.' " (*Ibid.*, quoting *Ardon v. City of Los Angeles* (2016) 62 Cal.4th 1176, 1190.)  As we have explained, we find no ambiguity in the statutory language or legislative intent of section 7922.530, subdivision (a).

24

The dictionary definition of the term "prompt" means "being ready and quick to act *as occasion demands*." (Merriam-Webster Unabridged Dict. Online (2026) <https://www.merriam-webster.com/dictionary/prompt#h3> as of May 11, 2026, archived at <https://perma.cc/QH2L-AM52>, italics added.) Similarly, Black's Law Dictionary defines the adverbial form "promptly" to mean "ready and quick to act *as occasion demands*," and further explains, "[t]he meaning of the word depends largely on the facts in each case, for what is 'prompt' in one situation may not be considered such under other circumstances or conditions." (Black's Law Dict. (6th ed. 1990) p. 1214, col. 2, italics added; see also Black's Law Dict.(12th ed. 2024) p. 1470, col. 1 [defining "promptly" as "[q]uickly; without delay," "[a]s soon as practicable . . . [c]ontext is all-important"].)

Giving the term its plain and commonsense meaning, as we must, we construe "promptly" in section 7922.530's duty of disclosure to require an agency to produce records quickly and without delay as the occasion demands.[22] Thus, whether an agency's public records disclosure is made

---

[22] The District has at various times stated that section 7922.530, subdivision (a), imposes a duty to produce responsive records "in a reasonably timely manner." Voice responds it "take[s] no issue" with this phrase but interprets that it "equates to [the] very same 'days or a few weeks' after records come into the possession of the agency" standard. We disagree with both parties. To the extent the District contends this is the proper statutory construction of the phrase "promptly available," we are not persuaded. The words "reasonably timely" do not appear in the text of the statute, and they are not necessarily synonymous with "promptly." In our view, "reasonably timely" conveys less urgency or priority than "promptly" demands and its importation into the statutory text will introduce unnecessary confusion. The reviewing court in *Rogers v. Superior Court* (1993) 19 Cal.App.4th 469, from which the District draws its alternative phrase, briefly addressed a petitioner's contention that a trial "court erred in determining that the City had complied in a reasonably timely fashion" with a public records request.

"promptly" depends on the circumstances of each case. This determination necessarily requires consideration of the scope and burden imposed on the *particular agency* by the *particular request*. Accordingly, we find no error in the trial court's conclusion that the term "promptly" in section 7922.530, subdivision (a), "allows for an evaluation of a variety of factors in assessing promptness of an entity's production of records."[23]

Appropriate factors to consider in assessing promptness include the specificity and breadth of the request, the nature and location of the records sought, the volume of data to be searched, the storage medium that must be accessed, the level of review required for any exemptions and redactions, and the complexity of the request; as well as the size, scope and complexity of the business or activities of the agency responding to the request. So, for example, a narrow and well-defined request that seeks easily accessible records will logically result in faster production than an overbroad and vague request that requires an agency to search through an enormous volume of data for a needle in the haystack. Further still, an agency made up of a single department that receives only a handful of public record requests each

Responding to this contention, the appellate court simply stated, "This latter finding is supported by substantial evidence." (*Id.* at p. 483.) Like *Citizens*, the lack of statutory interpretation analysis renders the statement unhelpful to us, and we decline to give it any weight.

[23] The District, like the trial court, relies on *Motorola, supra*, 55 Cal.App.4th 1340, as support that section 7922.530 allows for an evaluation of factors when assessing whether record production has been prompt. We do not place much significance on *Motorola* here. Because it involved the propriety of an attorney fees award, *Motorola* neither homed in on compliance with section 7922.530 nor construed the phrase "promptly available" beyond stating the CPRA "does not specify when records must be produced to a requesting party." (*Motorola,* at pp. 1344, 1349.)

26

year will logically be able to process productions faster than an agency comprised of a myriad of departments that receives a far larger number of requests annually.[24]

Additionally, we hold it is appropriate to consider whether external circumstances beyond the control of the agency impacted its ability to access, search for, collect, or examine the records sought—for example, a cyberattack that disrupts servers or systems, or a state of emergency such as the COVID-19 global pandemic that disrupts the agency's normal operations. Because the Legislature contemplated that similar circumstances would impact an agency's ability to comply with its duty of determination at the first step,[25] it would be illogical that these circumstances would also not be a

---

[24] The CPRA applies to a broad range of public agencies, varying in size, scope and complexity of public work. It defines a "public agency" to include "any state or local agency" (§ 7920.525, subd. (a)), and a " 'state agency' means every state office, officer, department, division, bureau, board, and commission or other state body or agency, except those provided for in Article IV [(legislative branch)] or Article VI [(judicial branch)] of the California Constitution" (§ 7920.540, subd. (a)), which includes the Regents of the University of California (*ibid*.) and the State Bar of California (*id*., subd. (b)). A " 'local agency' " includes a county, a city, a city and county, a school district, a municipal corporation, a district, a political subdivision and any of its board, commission, or agency, among others. (§ 7920.510.)

[25] As we have noted, an agency is expressly permitted an extension of 14 days to determine whether the request seeks disclosable public records in its possession if one of six "unusual circumstances" exist and "only to the extent reasonably necessary to the proper processing of the particular request." (§ 7922.535, subds. (b), (c).) These circumstances include: the "need to search for and collect the requested records from field facilities or other establishments that are separate from the office processing the requests"; the "need to search for, collect, and appropriately examine a voluminous amount of separate and distinct records that are demanded in a single request"; the "need for consultation, which shall be conducted with all practicable speed,

27

relevant consideration in how much time the agency will require at the second step of producing the requested records.

Voice argues the factors we have discussed, and relied on by the trial court, are "found nowhere in the law." But Voice misses the point. The Legislature's adoption of a deliberately flexible term to prescribe an agency's duty of disclosure allows consideration of such factors; its choice to *not* impose the hard deadline Voice advocates is an implicit rejection of a "one-size-fits-all" standard as inherently unworkable for all types of public record requests. Promptness therefore necessarily requires a fact-intensive, case-by-case analysis. And because it is a fact-intensive determination, we emphasize that we have not set forth an exhaustive or exclusive list of relevant factors. But neither is the list boundless. In this respect, we agree with Voice that courts should not accept "any and every reason" an agency proffers as a sufficient basis to find prompt disclosure. Courts are to be guided by the CPRA's constitutional imperative that public access to government records is a fundamental right of citizenship. (Cal. Const., art. I, § 3, subd. (b)(1) & (2).)

---

with another agency having substantial interest in the determination of the request or among two or more components of the agency having substantial subject matter interest therein"; the "need to compile data, to write programming language or a computer program, or to construct a computer report to extract data"; the "inability of the agency, because of a cyberattack, to access its electronic servers or systems in order to search for and obtain a record that the agency believes is responsive to a request and is maintained on the servers or systems in an electronic format"; and the "need to search for, collect, and appropriately examine records during a state of emergency proclaimed by the Governor in the jurisdiction where the agency is located when the state of emergency currently and directly affects, due to the state of emergency, the agency's ability to timely respond to requests due to staffing shortages or closure of facilities where the requested records are located." (§ 7922.535, subd. (c)(1)–(6).)

## II.

### *Substantial Evidence*

Turning to the evidence on Voice's allegations, the trial court found it did not establish the District engaged in "any 'illegal policies or practices' " of improperly delaying production of responsive records to Voice's requests, and consequently there was no basis to find an illegal expenditure of public funds within the meaning of Code of Civil Procedure section 526a. The court reached its conclusion after considering the evidence—which, all told, consisted of over 5,500 pages of exhibits and declarations submitted by the parties—and making detailed factual findings as to each of Voice's 31 requests.

### A. *Governing Standard of Review*

It is well settled that we independently review a trial court's interpretation of the CPRA but "factual findings made by the trial court will be upheld if based on substantial evidence." (*Times Mirror Co. v. Superior Court* (1991) 53 Cal.3d 1325, 1336; accord *Castanares v. Superior Court* (2023) 98 Cal.App.5th 295, 303–304; *San Lorenzo Valley Community Advocates for Responsible Education v. San Lorenzo Valley Unified School Dist.* (2006) 139 Cal.App.4th 1356, 1409, 1413; *Sacramento County Employees' Retirement System v. Superior Court* (2011) 195 Cal.App.4th 440, 454; see also *Michaelis, Montanari & Johnson v. Superior Court* (2006) 38 Cal.4th 1065, 1072 [on review of a trial court's determination of competing public interest factors under the CPRA, appellate court "should accept as true the trial court's findings of the 'facts of the particular case' " if supported by substantial evidence].) Despite settled law, Voice conspicuously avoids addressing the substantial evidence standard in its challenge to the trial court's ruling on the alleged CPRA violations. Instead, it asserts that "[t]here

29

are no material facts in dispute" and as such this court must "proceed[ ] solely under the de novo standard of review." (Italics omitted.)

We disagree that the material facts are undisputed. Voice concedes as much when in the same breath it states: "Certainly, [the District] does not agree with [Voice's] characterization of the facts." Our review of the record further reveals the parties heavily disputed the facts and the trial court resolved conflicts in the evidence. For example, as we shall discuss in further detail, the average length of delay itself was contested given that the parties did not agree on the District's production time. It is a fundamental rule of appellate procedure that an appellant's contention " 'should be tailored according to the applicable standard of appellate review' " and a failure to acknowledge or apply the proper scope of review "is a concession of a lack of merit" of that contention. (*Sonic Manufacturing Technologies, Inc. v. AAE Systems, Inc.* (2011) 196 Cal.App.4th 456, 465 (*Sonic*).)

Under the highly deferential substantial evidence test, we accept all evidence and draw all reasonable inferences supporting the trial court's judgment or finding, looking only at the evidence supporting the successful party and completely disregarding contrary evidence. (*Schmidt v. Superior Court* (2020) 44 Cal.App.5th 570, 581–582 (*Schmidt*).) Substantial evidence is evidence that is of ponderable legal significance, reasonable in nature, credible, and of solid value (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005–1006); the testimony of a single credible witness may constitute substantial evidence (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614 (*Mix*)).

30

"Under this standard of review, parties challenging a trial court's factfinding bear an 'enormous burden.' "[26] (*Schmidt*, at p. 582.)

Because Voice resists the governing standard of review, it does nothing on appeal to meet its enormous burden to demonstrate insufficient evidence. As the appellant, Voice is required to demonstrate "on the basis of the record presented to the appellate court," that the trial court committed an error that justifies reversal of the presumptively correct judgment. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; *Jameson v. Desta* (2018) 5 Cal.5th 594, 608–609 [judgment being challenged is presumed to be correct and error

<hr>

[26]   We note that an even more difficult standard may apply to Voice. Where the trier of fact has expressly or implicitly concluded that the party with the burden of proof—here, Voice—did not carry its burden and that party appeals, " 'it is misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment.' " (*Sonic, supra*, 196 Cal.App.4th at p. 465.)  " 'This follows because such a characterization is conceptually one that allows an attack on (1) the evidence supporting the party who had no burden of proof, and (2) the trier of fact's unassailable conclusions that the party with the burden did not prove one or more elements of the case.' " (*Ibid.*)  So " 'where the issue on appeal turns on a failure of proof at trial, the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law' " and specifically, " 'whether the appellant's evidence was (1) "uncontradicted and unimpeached" and (2) "of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding." ' " (*Id.* at p. 466.)  Under this standard, " 'it is almost impossible' " for the appellant to prevail " 'because unless the trial court makes specific findings of fact in favor of the losing plaintiff, we presume the trial court found the plaintiffs' evidence lacks sufficient weight and credibility to carry the burden of proof.' " (*Patricia A. Murray Dental Corp. v. Dentsply International, Inc.* (2018) 19 Cal.App.5th 258, 270.)  We do not proceed under this standard, however, because the District did not raise it and even under the traditional substantial evidence test we would find Voice has failed to meet its burden on appeal to demonstrate error.

must be affirmatively shown by appellant].) Voice's failure to carry or even address this burden could very well end the inquiry. However, we have reviewed the record and it provides substantial evidence to support the trial court's factual findings.

B.    *There Was No Finding, Nor Evidentiary Support, That the District Averaged 399 Days in Production Time*

We first address a finding the trial court did *not* make, and which Voice continues to improperly assert on appeal: that the District's average time in producing responsive records to Voice's CPRA requests is 399 days. This purported fact is nowhere to be found in the court's seven-page written ruling setting forth its detailed factual findings. To the contrary, the court noted that the parties dispute the District's production time as to many of Voice's requests, and that was because Voice relied "exclusively on the date of the *last* production," whereas the District relied on "all production dates" which included the first dates of rolling productions. (Italics added.) The court, however, found it unnecessary to resolve this conflict because, "[r]egardless" of the disputed production dates, Voice still "fail[ed] to establish any improper delay in production of records." Thus, there is no record support for Voice's continued assertion of this 399-days average.

But under the substantial evidence test, we look only at the evidence supporting the District's position as the successful party and completely disregard contrary evidence that may arguably support Voice's. (*Schmidt, supra,* 44 Cal.App.5th at pp. 581–582.) Here, we first note the uncontroverted evidence established that the District received over 75 public record requests from Voice during the relevant five-year period. The 31 CPRA requests at issue are what Voice chose to identify; thus, any

32

averaging of the District's production time is skewed by Voice's selective sampling of only forty-one percent of its total requests.

Second, in 10 of the 31 CPRA requests selected by Voice, the District produced responsive records on a rolling basis.[27] Voice, however, omitted the dates of the District's first release of responsive records for those 10 requests, resulting in grossly misleading response times in some instances, which in turn distorted any averaging of the District's production time. We provide two examples.

First, Voice asserted the District's production time in response to its request FY20162017.112 was 1,917 days. But including the first date when the District began releasing records, the District's production time began 78 days from the parties agreement on e-mail search terms.

Second, Voice asserted the District took 1,267 days to produce records in response to its request FY20152016.062 (one of the misconduct requests). Its computation ignored that the District actually completed production of responsive records 24 days from receipt of the request. Instead, Voice computed the length of days by using a date—more than three and half years later—when the District *voluntarily* provided an additional 26 pages of printed documents an employee inadvertently found in an unoccupied desk drawer during a search to comply with a subpoena by a different entity.

Although the number of days from receipt of a request to production is relevant, it is not, ordinarily, by itself dispositive of whether a production is prompt (or not). The record here reveals the District completed production in

[27] Rolling productions occurred for requests FY20152016.120, FY20162017.022, FY20162017.033, FY20162017.060, FY20172018.044, FY20172018.152, FY20182019.181, FY20192020.143, FY20162017.112, and FY20172018.065.

about 120 days or less for a large number of Voice's 31 requests and, as we later discuss, the trial court found the time taken appropriately correlates to the scope and burden of the requests. For example, the District produced responsive records:

In 104 days for FY20152016.058,[28] after Voice clarified the overbroad request and redactions were made for student privacy.

In 121 days for FY20152016.071,[29] with the request requiring a search of physical files from multiple custodians and "hundreds of redactions, largely consisting of confidential student information."

In 59 days for FY20152016.107,[30] which sought over a 10-year span of records that had to be retrieved from an off-site storage.

---

[28]   FY20152016.058 sought "a copy (electronic if possible) of any and all communications sent to Correia Middle School staff and/or teachers and/or student club advisors and/or student club leaders at all related to student club meeting rules, policies, limits and restrictions in the last month" to include "any memos, emails or other type of communication sent by Correia school site administrators or district officers to individual club representatives at Correia or en masse to all student clubs and student organizations."

[29]   FY20152016.071 sought "(1) All complaints, investigation reports, summaries, disciplinary recommendations and/or other disciplinary records, claims, allegations, incident reports, hearing records, including evidence presented in any such hearing, follow-up plans, and/or similar records relating to allegations of misconduct, physical abuse, harassment, inappropriate touching and similar activities relating to an incident occurring on or about September 2, 2014 and involving [K.K.]; and (2) All communications whether physical or electronic, not covered under the attorney-client privilege relating to item #1 above."

[30]   FY20152016.107 sought "Electronic copies of any and all records reflecting conflict of interest and ethics training for the Board of Education and other staff from 2005 to the present," to include "any and all ethics

In 70 days for FY20152016.144,[31] which required the District to coordinate with a variety of departments to locate responsive documents.

In 71 days for FY20182019.013,[32] in which the District started looking for responsive documents the same day it received the request.

In 108 days for FY20182019.202,[33] in which the District completed an e-mail search eight days from receipt of the request and found over 1,000

---

training completion certificates on file during that timeframe," and "[i]f no such records are kept showing who has completed ethics training, . . . any ethics training agenda items, staff reports and relevant minutes showing attendees at ethics training sessions," and "[i]f ethics training has not been provided every other year as required by the enactment of A[ssembly] B[ill] 1234," the reason "why."

[31]   FY20152016.144 sought "Any and all complaints filed at the school or district level regarding the trees at Miramar Ranch Elementary, and any and all records reflecting subsequent investigations, findings, actions taken and complaint remedies and outcomes," including "any and all reports and assessments about the health and safety of Miramar's trees by an arborist or any other staff or consultant," and "[i]f such an assessment . . . is contained in a broader district report on tree health and safety, . . . provide the entire report," for the period of "January 1, 2013 to present."

[32]   FY20182019.013 sought "student capacity of each district-run school . . . , with the corresponding school code" and "[i]f possible, . . . the capacity of only the district portion of each campus, not including any capacity that's already being used by a co-located charter school," and "[i]f the records . . . exist electronically in a single report or database, . . . the information [is to] be provided electronically (ideally in spreadsheet form) by email, rather than produced as individual school reports."

[33]   FY20182019.202 sought "Any emails written between [S.C.], [T.L.], [S.M.] and district area superintendents since Feb. 1, 2019 regarding federal program monitoring findings about the district's English-learner program," including "any emails between any combination of these employees, as well as emails which may contain other recipients beyond those listed."

e-mails to and from "high level" District officials that required careful review and redactions for attorney-client privileged communications.

In 68 days for FY20192020.085,[34] which sought, among other records, a nine-year period of "public records showing the names, hire and fire dates of any and all workers employed by the school district's police force."

In 34 days for FY20162017.095,[35] and the District had made arrangements for Voice to review the documents on an earlier date but no one for Voice showed up.

In seven days with the first tranche of records and 124 days later for final production for FY20172018.044,[36] which was overbroad in categories of

---

[34] FY20192020.085 sought "Public records showing the names, hire and fire dates of any and all workers employed by the school district's police force, . . . from the beginning of FY 2010 to the present" and "[i]f a comprehensive list is not available, . . . copies of whatever rosters or lists were created from FY 2010 to present, even if they only offer a snapshot of the workers at that time. For instance, if a roster was run or available for July 1 of each year, with or without their hire and fire dates, such rosters are requested," and "[i]f any of this information is available in electronic spreadsheet form, . . . for an electronic copy of that spreadsheet."

[35] FY20162017.095 sought "an electronic copy of the latest list of site Facility Condition Index (FCI) scores maintained by the [D]istrict. Specifically, . . . the most updated version of the information" shown in a hyperlinked 2013 report, to include "this list regardless of whether it has been presented to the ICOC or merely maintained by staff in facilities or another department in this format or another format, like an excel spreadsheet," and to indicate "[i]f for some reason the [D]istrict does not have a newer list showing individual site FCI scores any time after Feb. 7, 2013," and to indicate "[i]f there are plans to produce a new list before the end of the fiscal year," and "electronic copies of all Facility Condition Assessment (FCA) reports for district sites with FCI scores above 30 percent since 2008, even if the FCI subsequently fell below 30 percent following improvements and repairs."

records and, among other records, sought a seven-year period of dates and amounts of "any and all payments made to law firms and/or individual attorneys, regardless of funding source" and "annual compensation for each employee in the legal services division," and required "significant compilation of information" to provide Voice's preferred format.

In 116 days for FY20182019.181,[37] which required the District to gather cumulative and individual school reports over a three-year period

---

[36]    FY20172018.044 sought "The dates and amounts of any and all payments made to law firms and/or individual attorneys, regardless of funding source, from July 1, 2011 to the day this request is responded to.  [¶] If a description for each payment is readily available (i.e. the case name or number, the nature of the service rendered or reason for the payment, like a settlement, etc.), I ask the district to please provide that information. If the payment information I seek can be pulled from the district's check register system or some other electronic payment system, rather than gathering individual invoices, that is preferred.  If possible, I ask that this information be produced in electronic spreadsheet form by email, similar to the payment spreadsheet produced in the past for request FY20152016.066, for example. [¶]  The annual compensation for each employee in the legal services division from July 1, 2011 to present day.  At a minimum, this should include compensation for employees working in the Legal Services Office, Risk Management, and Labor Relations Departments during that seven year period.  Please include the name, position and total compensation amount for each employee each year.  All organization charts for the legal services division between July 1, 2011 and present."

[37]    FY20182019.181 sought for school years 2015 to 2018, "The results of the California Healthy Kids Survey for each school . . . [t]he results of the California School Staff Survey for each school . . . [t]he results of the California School Parent Survey (if it is administered) for each school" in the District; "any spreadsheets or other documents maintained or created by the district which aggregate the results of these surveys for each school," and "[i]f the results of these surveys are aggregated in a single or several documents," Voice indicated it "would be happy for these documents to supersede [its] requests for individual school survey reports"; "[i]f such documents are

from a variety of departments and required an additional production when Voice clarified it wanted individual school site reports, not the aggregate reports it received.

In 119 days for FY20192020.143, which sought "[a]ny and all official" class syllabuses for 2019–2020 English courses for "each high school" in the District, including specifically "one up-to-date syllabus for each high school English class." The District notified Voice the request was overbroad, explaining it had 15 comprehensive high schools and no standardized high school English class syllabus. As a result, the District would be required to collect a syllabus from each of over 100 English teachers during the COVID-19 mandated school closures.[38] Voice took 73 days to reject the District's proposal to narrow the request for faster production. Two weeks later, the District produced the first tranche of 995 pages, and the final production within 119 days.

Despite the evidence supporting the District's position that Voice's 399-days average is incorrect and misleading, Voice continues to improperly rely on it as its main evidence of the District's unlawful practice of delaying or obstructing disclosures in this appeal. Consequently, this is reason enough

___

historical and go back further than the three-year scope of [the] request, please include all of that information as well. If they are not historical, but rather created on a year-by year basis, please confine the request to [the] three-year window. If any data is available for the current school year, please also include it."

[38]    All District employees began working remotely on March 16, 2020. Appointment-based services for elementary schools began on October 13, 2020 but the majority of District staff did not return until late January 2021. For departments where in-person attendance was not necessary (i.e. staff who did not work with students), such staff members did not return until April 2022.

why Voice fails to demonstrate error by the trial court's finding that the predicate factual theory for its taxpayer cause of action was not proven.

C.    *No Unlawful District Practice or Policy of Delaying or Obstructing Disclosures*

We next discuss the trial court's factual findings as to the District's production for the 31 CPRA requests, but we emphasize that Voice's taxpayer cause of action was predicated on an unlawful *practice or policy* of delaying or obstructing disclosures by the District.  For this reason, we are not concerned with the trial court's findings as to any one or a few CPRA requests, but with its conclusion that there was no such unlawful practice or policy.

As support of the unlawful practice or policy, Voice claimed the District "constructed a system intended to slow down CPRA responses," including by employing a single CPRA officer (Day) who lacked formal training and was "ignoran[t]" of the CPRA requirements; whose absence brings the process to a "screeching halt" until he returns; and whose process of working on groups of 10 to 12 requests at a time ensures backlog and delay.  The trial court rejected these claims, finding that Voice "offer[ed] no evidence" that the District's systems were designed to delay or obstruct prompt disclosures.

To the contrary, the trial court specifically credited Pannone's testimony that the District's CPRA compliance methods are "substantially the same" as the numerous other unified school districts and local city governments.  This included employing a single CPRA officer to handle requests from initial review to production of records.  The court also accepted Pannone's testimony, which was consistent with Day's explanation of the District's processes, that "[t]he time to respond to a records request can vary depending on the volume and type of documents as well as the volume of other record requests and other duties of the [C]PRA officer.  In some cases,

39

depending on the breadth of the request and the search terms, the number of records requiring review, the nature of the records reviewed, and the volume of other requests, production of records may take over one year, or more to complete. In such cases, public agencies sometime produce records on a 'rolling' basis."

Under the substantial evidence test, we do not reweigh the evidence or reevaluate credibility. (*Greisman v. FCA US, LLC* (2024) 103 Cal.App.5th 1310, 1322.) Moreover, Pannone's testimony alone may constitute substantial evidence for the trial court's findings. (*Mix, supra*, 14 Cal.3d at p. 614 [single credible witness constitutes substantial evidence].)

Relying on Day's declarations, the trial court found the District's production time was justified given the scope and burden imposed on it by Voice's requests. As recounted, the court found "the majority" of Voice's 31 requests were overbroad, sought records over "extensive periods of time," lacked specificity, and were complex because Voice often requested information in a myriad of formats, and that these factors required the District to expend time in seeking clarification or modification from Voice. Additionally, the court found many requests required the District to search and review both electronically stored and hard copy records across multiple departments spanning 181 schools; and the nature of the records sought required significant time for the legal department to review and redact for exemptions, including student or employee privacy. Finally, the court found that the District was processing Voice's requests, with the burdens just described, amidst a large volume of public record requests during the relevant five-year period and, in some instances, during COVID-19 mandated school closures. These are all proper factors in assessing an agency's promptness in production of records, as we have held. And our review of the

record finds substantial evidence to support the court's finding of no pattern of improper delay based on these factors.

A handful of Voice's public records requests, viewed in the light most favorable to the judgment, demonstrate that substantial evidence supports the District's production time as prompt under the circumstances.

Regarding the three misconduct requests, (FY20152016.062, FY20152016.136 and FY20192020.151), Voice asserted that these requests demonstrated a pattern of an unlawful CPRA practice. The trial court rejected this claim because it had already found at the December 2022 hearing, that the District's production was prompt relative to the overbreadth, lack of specificity, and burden these requests imposed. Nothing Voice presented in February 2024 changed the court's prior ruling. Day's declaration supports the court's findings and we will not reweigh the evidence or Day's credibility: FY20152016.062 was produced in 24 days; FY20152016.136 was overbroad, necessitated clarification, and extensive redactions before production; and FY20192020.151 was overbroad, lacked specificity, required significant coordination between departments, and the COVID-19 pandemic hampered production.

Turning to the other requests, Day's declaration once again supports, that the District acted promptly under the circumstances. For example, FY20162017.112, submitted on April 5, 2017, sought:

> "All emails sent or received by [*employee name omitted*] from January 1, 2016 to December 1, 2016 that contain one or more of the following words: 'raise'; 'pay'; 'increase'; 'salary'; 'salaries'; 'SDEA'; 'budget'; 'money'; 'cash flow'; 'TRANs'; 'negotiations'; 'negotiate'; 'bargain'; 'good'; 'bad'; 'wrong'; 'right'; 'January'; 'May'; 'revise'; 'governor'; 'San Diego County Office of Ed'; 'SDCOE'; 'Cindy'; 'Lindsay'; 'Richard'; or 'LCFF[.]' Please include any earlier emails part of the email chain even if they fall outside the

41

time frame specified or do not contain one of the keywords. Please also include any and all attachments."

Given the breadth of this request and the use of grossly generic and broad search terms, the District's first search of its server yielded 31,771 e-mails. The file was too large to be exported and caused the District's system and computers to crash multiple times. As a result, between July 2017 and April 2018, the parties met and conferred numerous times regarding how to narrow the request to avoid crashing the District's system. Voice only agreed to limit the time span, which did not alleviate the problem, and the broad search terms continued to crash the system. On April 26, 2018, the District told Voice the request was overbroad, lacked specificity, and consequently it would close the request. Only then did Voice narrow its request by asking the District to "run a search one month at a time with a couple key words at a time."

The District agreed, and three days later on May 1, 2018, the District manually exported a file of one month's worth of potentially responsive records, consisting of 8,300 pages of e-mails. Because the District estimated it would take 43 working days with one employee assigned solely to the task of reviewing and making redactions, the District informed Voice it would produce responsive records on a rolling basis. The District released the first tranche of 464 pages on July 13, followed by 21 more tranches of records. By the time production was complete for this request, on July 5, 2022, the District had produced 12,725 pages of e-mails to Voice. Throughout the process, the large export files containing the e-mail data continued to crash the District's system, which "further elongat[ed] the estimated review time." Although the District provided Voice with "many opportunities" to narrow the search parameters or identify with more specificity the documents sought to

42

speed up production, "Voice refused to do so." In the absence of a request that "reasonably describes" identifiable records, like in this instance, the time the District spent working with Voice to revise the request cannot be attributed to the District.

Other requests were of a similar character. FY20162017.028 made the following request:

> "I am writing to request inspection of the following records: All emails and/or electronic communication dated between August 1, 2015 and August 30, 2016 to and/or from the following individuals: [*24 e-mail accounts omitted*] containing or related to the following keywords: 'on track' 'A–G' and/or 'A to G' 'grad,' 'graduate' and/or 'graduation' 'dropout,' 'drop-out' and/or 'drop out' 'charter school' 'credit recovery' 'inflation['] and/or 'inflate' 'fail' and/or 'failure' 'Fs' and/or 'F's' 'Ds' and/or 'D's' '92%' and/or '92 percent' 'Voice of San Diego,' 'VOSD,' 'Voice,' 'Mario,' and/or 'Koran.' "

This request, too, was overbroad. The District tried, multiple times, to conduct the search but its system crashed on two separate occasions due to the breadth of the search terms. When the District was finally able to complete the search, it yielded 131,971 e-mails. Day then informed Voice the request was overly burdensome and would likely require extensive review and redaction given that the search terms were connected to sensitive information. Day asked Voice to narrow the search terms. Even with modifications, the search produced 6,525 pages requiring significant redactions. At the time, the District had a large volume of requests and was processing requests in the order of receipt. Day produced 5,500 documents 373 days after the request.

Similarly, FY20192020.062 requested as follows:

> "Please provide all public records relating to claims of physical and/or verbal misconduct committed or otherwise related to teacher [*name omitted*] from the beginning of his employment to

43

present. The responsive records should include, but not be limited to, all claims, allegations, complaints, discipline records, inquiries, investigations, reports, analyses, and similar materials bearing on each incidence of misconduct.  Please also keep in mind that pursuant to *Caldecott v. Superior Court* (2015) 243 Cal.App.4th 212, 225 that the personnel file exemption found at Government Code section 6254[, subdivision] (c) is inapplicable as an exemption to this request unless the San Diego Unified School District determined that the allegations are 'so unreliable that they "could not be anything but false." '  In other words, the District need not have determine the allegations to be true or well-founded, or to have imposed discipline on [the teacher], for the mandatory release of such public records as provided in the Caldecott case."

This request required coordination with various departments to compile responsive documents and substantial review and redactions given the sensitive nature of the request.  During this time period, the District was receiving a high volume of public records requests.  In an attempt to be more efficient, the District was processing narrower requests that could be completed in one or two days first, over broader requests that necessitated compilation from multiple sources and review of a high volume of documents.  Additionally, COVID-19 closures complicated the production of documents, as did the provision of a *Marken*[39] notice to the teacher.  After obtaining an extension to respond, the teacher obtained legal counsel and objected to release of the records.  After discussions with the teacher's legal counsel, the teacher indicated he would not file a reverse CPRA action to prevent

---

[39]     *Marken v. Santa Monica-Malibu Unified School Dist.* (2012) 202 Cal.App.4th 1250, 1266, recognized the viability of a "reverse-CPRA action," in which a third party who is the subject of a CPRA request may bring suit to prevent disclosure of the records.

disclosure. The District then produced the records, 390 days from the date of request.

In March 2017, Voice sought the following in FY20162017.099:

"[R]equest inspection of the following records: Annual staffing counts for the district's different employee groups going back to at least 2006—07. At a minimum, I am asking for separate unduplicated staffing counts for teachers, classified staff, pupil services employees and administrators districtwide, excluding charter schools. If possible, I ask that the staffing counts be reported in either FTEs or as headcounts for all groups. Please do not provide only an FTE count for one group and only a headcount for another. If both numbers are available for each group, I'd like both."

Seeking documents over a period of 10 years for a variety of positions, this request was also overbroad and vague. It required Day to contact numerous employees to determine the locations of responsive documents. When Day sought clarification from Voice regarding the preferred format, Voice did not respond. When Day followed up again regarding the types of "counts" requested, it took Voice more than a month to respond. The District produced the request 207 days after the initial request, while facing a large volume of prior requests that were being processed in the order of receipt.

In another example, Voice sought the following in FY20162017.101:

"The resumes and qualifications for all management employees in both the budget and finance departments that are represented by the Administrators Association of San Diego or hold a position of a higher rank, such as director and executive director. All resumes received from applicants interviewed in November 2016 for the position lead financial planning analyst. Scoring sheets from all interview panelists for both rounds of interviews for the position lead financial planning analyst that took place in November 2016."

45

This request lacked specificity because it did not identify any employees by name. The "resumes and qualifications for all management employees" were stored in individual personnel files, requiring Day to review the entire personnel files of numerous employees to find the requested records. This was an extremely time-consuming task. Likewise, the "resumes" of "applicants" and "scoring sheets" were not located in a single location, but across different departments, including an off-site record retention facility. The responsive documents then required significant redactions, which also had to be reviewed by counsel. Facing a large volume of other prior requests and processing requests in the order of receipt, Day produced the records in 312 days.[40]

On the whole, our review of the record finds substantial evidence supports the trial court's finding that the District did not employ a practice or policy of unlawfully delaying production of records for Voice's requests. Rather, as California's second largest unified school district, the District is an agency of sprawling size, managing a high volume of CPRA requests for records that, by their nature, routinely implicate student and employee privacy interests. To this particular agency, Voice regularly submits broad, multi-questioned, and unspecific requests that, in many instances, required time for the parties to negotiate clarification and narrowing of search terms; and time for the District to coordinate with multiple departments to locate responsive records, compile thousands of responsive documents kept in various storage mediums, and make copious redactions to protect student

---

[40] In two instances, the trial court credited Day's declaration that the District inadvertently withheld records due to human error. Two instances of inadvertent withholding over the course of five years does not demonstrate a pattern of illegal conduct.

and employee privacy interests. And, during part of the five years at issue, the District, like all other schools in the state, closed its campuses under a state of emergency mandate because of the unprecedented COVID-19 pandemic. Under these circumstances, and the governing standard of review, Voice has failed to demonstrate substantial evidence does not support the trial court's factual findings that the District did not employ an unlawful CPRA policy or practice of withholding or delaying disclosures.

III.

*Forfeited Claims*

In its opening brief on appeal, Voice asserts the District's unlawful CPRA practice also includes regularly violating its duty of determination under section 7922.535, subdivision (a), by: (1) failing to "search, collect[ ] or examin[e]" potentially responsive and disclosable records within the statutory 10- or 24-day deadline; (2) failing to set forth the statutorily required reasons for its initial determinations; and (3) "suspend[ing]" or "postpon[ing]" CPRA operations when Day is absent from the office. It also makes a fleeting assertion that the District regularly violated its duty to assist a requester (§ 7922.600).[41]

Voice did not squarely raise any of these claims at the hearing to adjudicate its petition as to the taxpayer cause of action, the denial of which is the only decision it has challenged in this appeal. Consequently, they are

_____

[41] Section 7922.600, subdivision (a), provides, that upon a request for a public record, the agency, to assist the requester in making an effective request, "shall [in part and] to the extent reasonable under the circumstances . . . assist the member of the public to identify records and information that are responsive to the request or to the purpose of the request, if stated."

47

all forfeited. (*Howitson v. Evans Hotels, LLC* (2022) 81 Cal.App.5th 475, 489 ["failure to raise an issue in the trial court typically forfeits on appeal any claim of error based on that issue"].) Voice impliedly concedes it has forfeited these claims because it is silent, in its reply brief, as to the District's assertion of forfeiture. (*Rudick v. State Bd. of Optometry* (2019) 41 Cal.App.5th 77, 89–90 [failure to respond to an argument in a reply brief constitutes an implicit concession].)

Further, as to Voice's claim that the District regularly violates section 7922.535, subdivision (a), by failing to *search, collect, and examine* disclosable records within the statutory 10- or 24-day period after receipt of a request, we conclude it is also waived.[42] As recounted, in its June 11, 2021 ruling, the trial court summarily adjudicated the exact same statutory construction claim in favor of the District. There, Voice alleged the District violated section 7922.535, subdivision (a), " 'by failing to secure responsive records within the statutory 10-day initial response period.' " The court determined this claim failed, as a matter of law, because the CPRA "does not require agencies to '*secure* responsive records' within 10 days of receiving a request." (Italics added.) But nowhere in its briefing on appeal does Voice develop a separate argument, under a separate heading, challenging the trial court's summary adjudication ruling. (See Cal. Rules of Court, rule 8.883(a)(1)(A) [appellate briefs must state each point under a separate

---

[42]    We granted the First Amendment Coalition's application to file an amicus curiae brief in support of Voice. Amicus's brief, however, focuses solely on whether section 7922.535 requires an agency to locate, collect, and review records responsive to a request before notifying the requester of its determination. Because we conclude Voice's section 7922.535 claim is not properly before us, for the numerous reasons we have identified, we do not address the arguments by amicus in its brief.

heading]; *In re Sade C.* (1996) 13 Cal.4th 952, 994 [appeal may be deemed abandoned where appellant fails to abide by essential requirements of an appeal, including the requirement of providing a "reason to reverse or even modify" the order appealed]; *Roe v. McDonald's Corp.* (2005) 129 Cal.App.4th 1107, 1114 [failure to identify a challenged ruling in a separate heading and analysis results in waiver].)  Consequently, this argument is not before us.

We acknowledge our discretion to review unpreserved claims that present purely legal questions, but we decline to exercise our discretion in this case.  The underlying facts are disputed.  (See *Cedars-Sinai Medical Center v. Superior Court* (1998) 18 Cal.4th 1, 6 [unpreserved issues of law may be considered for the first time on appeal if there are no disputed facts].)  But even without factual disputes, forfeiture is the proper outcome.  This litigation has spanned over six years, involved extensive discovery, and adjudication of two writs to decision.  Voice has had ample opportunity to prosecute all of its claims in the trial court.

IV.

*Conclusion*

In sum, Voice has failed to carry its appellate burden of demonstrating reversible error.  Substantial evidence supports the trial court's determination that the District did not engage in any illegal policies or practices of improperly delaying production of responsive records to Voice's requests.  And because Voice failed to establish the challenged governmental conduct was illegal, the trial court properly denied relief on its taxpayer cause of action.  (See *Lyons, supra*, 231 Cal.App.4th at p. 1503; *Coshow, supra*, 132 Cal.App.4th at p. 714.)

## DISPOSITION

The judgment is affirmed.  The District shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(2).)


DO, J.

WE CONCUR:


O'ROURKE, Acting P. J.


DATO, J.

CERTIFIED FOR PARTIAL PUBLICATION[*]

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| VOICE OF SAN DIEGO et al., <br><br>     Plaintiffs and Appellants, <br><br>     v. <br><br> SAN DIEGO UNIFIED SCHOOL DISTRICT, <br><br>     Defendant and Respondent. | D084327 <br><br> (Super. Ct. No. 37-2018-00026433-CU-WM-CTL) <br><br> ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PARTIAL PUBLICATION <br><br> NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed on May 11, 2026, be modified as follows:

1.    On page 2, line 5 of the second full paragraph, delete the sentence beginning with "According to Voice." The paragraph is now modified to read as follows:

> Contending that "promptly available" means " 'within days or a few weeks' " of the initial 10- or 24-day deadline,

---

[*]    Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of parts II and III of the Discussion.

Voice of San Diego and its editor-in-chief Scott Lewis (sometimes together, Voice) alleged the San Diego Unified School District (District) routinely obstructs and delays the disclosure of public records. Voice filed a petition for writ of mandate asserting, among other causes of action, a taxpayer claim pursuant to Code of Civil Procedure section 526a to enjoin the District's illegal expenditure of public funds to maintain the alleged unlawful CPRA practice.

2. On page 3, the fourth sentence of the paragraph above the Background, revise the sentence beginning with "We further" to read as follows:

We further conclude, in the unpublished portion of this opinion, that substantial evidence supports the trial court's factual findings that the District did not maintain an unlawful practice of violating the CPRA.

There is no change in the judgment.

The opinion in the above-entitled matter filed on May 11, 2026, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be partially published in the Official Reports and it is so ordered.

O'ROURKE, Acting P. J.

Copies to: All parties

2